**ELLIOT COAL MINING COMPANY, INC., Petitioner,**

v.

**DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS, United States Department of Labor, Benefits Review Board, United States Department of Labor, Metro Kovalchick, Respondents.**

United States Court of Appeals, Third Circuit.

Argued Feb. 25, 1993.

Decided Feb. 9, 1994.

618

Stephen Yakopec, Jr., Elise Glenn, Mark R. Hornak, (Argued), Buchanan Ingersoll Professional Corporation, Pittsburgh, PA, Attorneys for Petitioner.

Marshall J. Breger, Solicitor of Labor, Donald S. Shire, Associate Solicitor for Black Lung Benefits, Michael J. Denney, (Argued), Counsel for Appellate Litigation Karen N. Blank, United States Department of Labor, Office of the Solicitor, Washington, DC, Attorneys for Respondent Director, Office of Workers' Compensation Programs.

Present: HUTCHINSON and NYGAARD, Circuit Judges, and POLLAK, District Judge*.

## OPINION OF THE COURT

HUTCHINSON, Circuit Judge.

Elliot Coal Mining Company ("Elliot") petitions for review of an order of the United States Department of Labor Benefits Review Board ("Board"). The ultimate question in this case is whether Elliot or the Black Lung Disability Trust Fund (the "Trust Fund"), financed by an excise tax on coal, must pay black lung benefits due Metro Kovalchick ("Kovalchick" or "claimant") and sixteen other miners who once worked in Elliot's mines.[1] The threshold issue is whether that

---

* Hon. Louis H. Pollak, District Judge of the United States District Court for the Eastern District of Pennsylvania, sitting by designation.

1. Kovalchick's case is one of sixteen cases that were administratively consolidated to determine the question, common to all sixteen, whether Elliot is a "responsible operator." *See Yebernetsky v. Elliot Coal Mining Co.*, BRB No. 84–2560 BLA (June 30, 1988). After the Board deter-

mined that issue adversely to Elliot, the parties stipulated that Kovalchick was entitled to benefits. Accordingly his case became the first of the sixteen to present to this Court the merits of the common question whether Elliot is an operator responsible for payment of benefits due any one of the sixteen. The current administrative status of the other fifteen cases with respect to entitlement as opposed to responsibility is not clear on the record before us.

question is one of law or fact. The Board, contrary to an administrative law judge's ("ALJ's") finding, held Elliot liable for payment of black lung benefits to any of its employees after December 31, 1969,[2] who suffer disability or death as a result of pneumoconiosis because it was a "responsible operator" within the meaning of the Black Lung Benefits Act, ("the Act"), 30 U.S.C.A. §§ 901–945 (West 1986 & Supp.1993). *Yebernetsky v. Elliot Coal Mining Co.*, BRB No. 84–2560 BLA 8–9 (June 30, 1988) ("*Yebernetsky II* "). It then remanded this case to the Department of Labor's Office of Administrative Law Judges for a determination of whether Kovalchick was entitled to black lung benefits under the standards of the Act relating to disability and causation. On remand, the parties stipulated Kovalchick did meet the standards of the Act and was entitled to benefits. The ALJ therefore directed Elliot to pay benefits to Kovalchick in accordance with the Act. The Board affirmed, and this petition for review followed. In it, Elliot questions the Board's holding that it was a "responsible operator."

Respondent, the Director of the Office of Workers' Compensation Programs ("Director"), contends that Elliot was a responsible operator on three independent bases: (1) the Act imposes liability on all owners or lessees of coal lands without regard to their control or supervision of the mines; (2) Elliot qualifies as an operator who is responsible for black lung benefits due its former employees because, after June 30, 1973,[3] it re-

tained a substantial right to control the mining operations of others who mined coal on its lands through provisions in their mining leases and subleases giving Elliot the right to monitor production, receive royalties based on minimum periodic tonnages, and to reenter coal lands for breach of those leases or subleases; and (3) Elliot employed "miners" after June 30, 1973.

We reject the Director's first argument as contrary to the text of the statute.[4] Our decision in that respect is supported by the text, punctuation and grammatical structure of § 802(d), the Secretary of Labor's ("Secretary") own regulations, and the legislative history of the Act in general and that of § 802(d) in particular.

We agree with the Director that a mining company that reserves an effective power to substantially control the coal mining operations of others on lands it once mined continues to be a coal mine operator responsible for black lung benefits due its former employees and that evidence showing this power to control has been exercised is not required. Moreover, where the lessor and the lessee are closely affiliated companies, we believe that existence of a power to control the lessee should be presumed. We believe, however, that in other cases, when the former operator is not related to or affiliated with the person to whom the right to mine coal has been given, the question whether an owner or lessor of coal lands has reserved a substantial power to control continuing oper-

---

**2.** December 31, 1969 was the effective date of the Federal Coal Mine Health & Safety Act of 1969, Pub.L. No. 91–173 § 509, 83 Stat. 742 (1969) (the "1969 Act"), the statute that first provided a federal entitlement for black lung benefits. *See* Part IV *infra.*

**3.** The 1969 Act was amended by the Black Lung Benefits Act of 1972, Pub.L. No. 92–303, 86 Stat. 150 (1972) (the "1972 Act"). These amendments liberalized benefits and imposed primary liability on the mining companies. The black lung program was again amended and further liberalized retroactively by the Black Lung Benefits Reform Act of 1977, Pub.L. No. 95–239, 92 Stat. 95 (1978) (codified at 30 U.S.C.A. §§ 901 *et seq.*) (the "Reform Act"). When Congress passed the original act, its cost was not fully appreciated. This unforeseen cost plus the impact of its transfer to the mining companies and the impact of the new entitlement rules caused Congress to

create a transition period from January 31 to June 30, 1973, during which mining companies could avoid liability for benefits due their former miners by effectively closing all coal mining operations on or before June 30, 1973. *See* Part IV *infra.* What constitutes an effective cessation of operations and who decides when and whether mining operations have stopped is the key to this dispute.

**4.** Section 802(d) reads as follows:

For purposes of this [Act], the term—

*        *        *        *        *        *

"operator" means any owner, lessee, or other person who operates, controls, or supervises a coal or other mine or any independent contractor performing services or construction at such mine....

30 U.S.C.A. § 802(d) (1986).

ations involves inferences on which an ALJ's findings are conclusive if supported by substantial evidence. We think this holding is supported by the statements of the Secretary[5] concerning the 1977 amendments to the Act in which she said that the question of who is a responsible operator is to be determined on a case-by-case basis. Conversely, we do not believe that the statute or the regulations indicate that a lessor's bare reservation of a legal right of re-entry, combined with a requirement of minimum royalty payments, a right to an accounting for the tonnage produced from the leased land, and a right to monitor compliance with state and federal regulations demonstrate continuing operation as a matter of law.

Accordingly, whether Elliot had the power to exercise substantial control was a question of fact to be resolved by an ALJ. The record before us shows no interlocking corporate relationships between Elliot and any of the corporations or other persons from whom or to whom it had leased any of the coal lands it worked prior to June 30, 1973. There is evidence that the lease provisions concerning re-entry, minimum royalties and verification of tonnage were provisions that Elliot had to require of its lessees in order to avoid termination, at its own lessors' hands, of its rights to mine coal or allow others to do so. There is also evidence that all of the leases and subleases from Elliot to the operators who continued to mine coal after June 30, 1973, were made to facilitate Elliot's liquidation after it had suffered severe losses in its own mining operations on the coal lands in question. Thus, we believe the ALJ's finding that Elliot was not an operator after June 30, 1973, is supported by substantial evidence.

Finally, there is substantial evidence to support the ALJ's finding that the two employees Elliot retained after June 30, 1973, were not miners within the meaning of the Act. Therefore, we will grant Elliot's petition for review and remand the case to the Board with instructions to vacate its order reversing the ALJ's finding that Elliot was not, after June 30, 1973, an operator who is responsible for benefits due its former miners and thereafter for further proceedings consistent with this opinion.

## I. Statement of Facts

Elliot employed Kovalchick as a miner from 1965 until he retired for failing health on July 15, 1971. Before June 30, 1973, Elliot operated a number of surface and underground coal mines on coal lands it either owned or leased from others.[6] By June 22, 1973, Elliot had ceased active mining and was beginning to divest itself of its mining equipment. By that time, Elliot had accumulated losses of about four million dollars from its mining operations. Because of these losses, Elliot had been winding down its mining operations. In June 1973, Elliot's lessors asked why the lands Elliot leased from them were no longer being mined as required by the lease terms. Elliot's lessors included the Kittaning Coal Company, the Philipsburg Coal & Land Company, General Refractories, Phyllis Daughenbauch, Barney Finberg, James G. Clune, and Mid-State Bank & Trust Company (Middle Pennsylvania Coal Corporation). There is no evidence that any of these lessors were affiliated with Elliot, shared controlling stockholders or otherwise had common or related corporate ownership.

Elliot entered into sublease arrangements with independent contractors to avoid a continuing breach of its mining leases and a consequent loss of its right to the coal in place on the leased lands. The sublessees included Helena Coal Co. ("Helena"), W.C. Bowman ("Bowman"), Power Contracting Co. ("Power"), J. Arthur Minds ("Minds"), and Jerry Demchak ("Demchak"). There is no evidence that any of Elliot's lessees or sublessees were then affiliated with Elliot,

---

5. The Secretary of Labor is the person to whom courts generally must defer in connection with interpretations of the Act. *See Mullins Coal Co. v. Director, OWCP*, 484 U.S. 135, 159, 108 S.Ct. 427, 440, 98 L.Ed.2d 450 (1987).

6. Most of Elliot's coal mining operations were on lands it leased from others, but it had done some deep mining on lands it owned in fee.

shared controlling stockholders or otherwise had common or related corporate ownership.[7]

According to Elliot, it had little choice in setting the terms of these subleases because operations under them had to be in compliance with the terms of the prime leases on which the subleases depended. Revenues generated from the subleases were, in the main, passed on to Elliot's lessors. A letter dated November 14, 1973, from John Murphy, then Elliot's president and general manager, addressed to L.T. Phillips, agent for the Kittaning Coal Co. and the Philipsburg Coal & Land Co., two of Elliot's lessors, stated:

> Elliot Coal Mining Co. recently suspended its operations because it was impossible to make a profit at the existing coal prices for the quality coal we were able to produce.
>
> *   *   *   *   *   *
>
> We have under consideration a proposal, to be implemented within a few days, to employ contractors to mine the coal & to procede [sic] with the construction of a cleaning plant to improve coal quality.
>
> We propose to employ sufficient contractors to raise the production rate to at least 300,000 tons per year over the next 12 months. We propose simultaneously to begin a coal drilling program to identify coal locations and quality so that we may construct a coal cleaning plant in approximately nine months from now. . . .
>
> We recognize that the land owners would like to see more revenue income from these lands. Our company also would like to obtain substantial revenue so as to recoup our investment.
>
> This program will be put into effect immediately and I trust we both will receive substantial economic benefit from it.

Appendix ("App.") at 413–14. Robert Long ("Long"), former President of Elliot, stated

at his deposition that Murphy's letter was intended to forestall Elliot's lessors from terminating Elliot's mining rights for the breach of its leases until Elliot could find a buyer for them and perhaps recoup some of its own four million dollar operating loss. He stated that Elliot never attempted to construct a cleaning plant as mentioned in the letter[8] and that Murphy was simply trying "to maintain the lease until he maybe could find a buyer for it or something." App. at 516. Although Elliot had shut down production, Murphy was still interested in retaining the leases "[t]o have something to sell to recoup something against the four million dollars [Elliot had lost]. That was the only chance he had to recover anything other than equipment that was sold, and that was for very little pennies on the dollar, I suppose." App. at 516.

In any event, Elliot did sublease its coal mining rights for various lease terms, as determined by its prime leases. All had similar, though not identical provisions, but all were negotiated at arms length. The terms of the subleases ranged from one to fifteen years with options to renew. Elliot's lessees and sublessees continued to operate under surface mine permits that state regulatory authorities had issued to Elliot.

The Helena and Bowman subleases dated September and October 1973, and February and March 1975, are typical. In them, Helena and Bowman agreed to a minimum annual tonnage production as well as minimum monthly royalty payments to be credited against any royalties due on tonnage actually produced. Elliot reserved the right to inspect weighing and shipping records and had a right of entry or re-entry into the mine in order to survey the workings and produce current maps. Elliot had the right to terminate in the event of breach, and the Bowman lease also included a forfeiture clause.[8]

---

7. There is some evidence that either Helena or Power, two of the sublessees, ultimately became successors to Elliot, but even that evidence is conflicting. At one point the record indicates that Elliot was sold to Helena or Power around September 1975, but it also contains a copy of a lease between Elliot and Power dated in 1978. This could indicate that Elliot ultimately came under the control of Helena or Power, but not

vice versa. There is no other evidence of any relationship between Elliot and any of its lessees or sublessees.

8. Under Pennsylvania law, sale of the coal in place often occurs under an agreement called a lease. Transfer of the mineral in place occurs when the agreement authorizes the so-called

The monthly tonnage royalty and minimum tonnage production required by Elliot's 1978 lease of all the coal seams to which it had title to Power were subject to reduction at Elliot's option if it were shown by a study of the coal seams that extraction of the minimum was not practicable. Power also had to provide maps demonstrating past and projected mine workings. Power's "lease" provided if Power defaulted in the minimum monthly tonnage royalty payments or violated any other lease conditions Elliot had a right of re-entry and an irrevocable and exclusive option to lease back from Power those tracts of land covered by the Philipsburg and Kittaning leases. If Elliot exercised this right of re-entry, Power agreed to do "each and every act necessary or helpful to Elliot to assist Elliot in evaluating the lands covered by this option ... including, but not limited to, permitting Elliot to operate on any mining permits held by Power or its affiliates to the extent permitted by law or regulation." App. at 245. Elliot also had the right to enter the mines for inspection and sampling purposes and to reenter upon default without a court order.

Elliot ceased its own mining operations on June 22, 1973, and none of the lease agreements were effective until after June 30, 1973. After June 22, 1973, Elliot retained only two employees, Larry Kanour ("Kanour") and Judi Matia ("Matia"), to ensure the lessees' and sublessees' compliance with the lease terms. After June 1973, Matia assisted in winding up Elliot's business affairs and closing its books but continued to process royalty payments and tonnage reports from Elliot's lessees and sublessees. In the fall of 1973, Helena took over Elliot's office, and thereafter, both Matia and Kanour went on Helena's payroll.

Because the subcontractors were still working under Elliot's permits, from June 1973 until September 1975, Kanour continued to do some of the environmental inspection duties he had done for Elliot since 1962. Kanour also continued to do on-site inspections at the five strip mines occupied by Elliot's sub-lessees and provided them with advice on various mining subjects. He was instructed to report any problems to Elliot, but there were none.

Demchak, one of Elliot's contractors, stated in an answer to interrogatories that Elliot had not operated any coal mine after June 30, 1973. Demchak did not know anyone who worked as a miner for Elliot, and he said his own coal production was not aided or directed by Elliot in any way. Bowman and Fred Fruguiel, two other contractors who worked some of Helena's mines under Elliot's permits, gave similar answers to interrogatories. Minds, who also worked Helena's mines under the Elliot permits, said on direct examination that Elliot did not exercise any control over his mining operations. Long and Beatrice Avery ("Avery"), President of Helena and later the President of Power as well, stated in their depositions that Elliot was not producing coal after 1973 and did not send people out to supervise or assist with the mining operations. Avery admitted listing Elliot as the operator of the mines in production reports to the Pennsylvania Department of Environmental Resources ("DER") but explained that either Helena or Power at all times after June 30, 1973, was the actual operator mining in accord with state regulations under Elliot's permits. Avery was under the impression that if a mining violation had occurred, Helena or Power, not Elliot, would have been cited. According to her, Helena and Power

"lessee" to mine the coal to exhaustion. *See Hummel v. McFadden*, 395 Pa. 543, 150 A.2d 856, 861–62 (1959) (mining agreement may constitute "a sale absolute, a conditional sale, a lease in the ordinary [acceptance] of that term, or a mere license to mine and remove the minerals" and "the character of the transaction [is] controlling" rather than the form of document employed and language utilized; because agreements in question gave McFadden "full and complete dominion over the coal until the exhaustion thereof," they were deemed "sales of the coal in place") (brackets in original; citations omitted); *Lichtenfels v. Bridgeview Coal Co.*, 344 Pa.Super. 257, 496 A.2d 782, 785 (1985) ("A sale of coal in place in the ground, or what amounts to the same thing, an agreement leasing the minerals underneath the land until their exhaustion, conveys fee simple in the minerals to the lessee ... such a lease is thus considered an outright grant of an estate in the minerals to the lessee.") (citations omitted). Elliot's leases and subleases were leases to exhaustion.

continued operating under Elliot's permits from 1973 until April 1978 when both Helena and Power were sold.

## II. *Procedural History*

On May 15, 1978, Kovalchick filed a Part C claim for medical benefits with the Department of Labor ("DOL").[9] Under Part C, coal mine operators who are liable for benefits payable to their former employees are included in a regulatory category called "responsible operators."[10]

A delegate of the Secretary initially made an administrative decision that Elliot was a "responsible operator" liable to pay any black lung benefits Kovalchick was entitled to. Elliot appealed and asked for a hearing before an ALJ. It was held on July 13, 1982, for the purpose of determining whether the administrative ruling that Elliot was a coal mine "operator" and the "responsible operator" was in accord with 30 U.S.C.A. § 802(d) and 20 C.F.R. Part 725, Subpart F. On July 26, 1982, ALJ Kerr decided to remand the case to a DOL deputy commissioner for further consideration of this issue. On remand, one of the DOL's deputy commissioners reaffirmed the administrative decision that Elliot was the responsible operator. On August 18, 1983, DOL sent the Kovalchick case back up to its Office of Administrative Law Judges, where it joined fifteen others in which Elliot had been designated a responsible operator. The ALJ consolidated all sixteen claims in order to resolve the common issue of whether Elliot was a "responsible operator." *See Yebernetsky II*, BRB No. 84–2560 BLA at 8–9. Elliot argued it was not a responsible operator because it did not operate, supervise or control any coal mine after June 30, 1973.[11] The Director relied on *Long v. Clearfield Bituminous Coal Corp.*, 1 BLR 1–149 (1978), in which the Board held that an owner of coal mines who had ceased operations but leased the mines to other entities which continued to mine the property was a responsible operator for purposes of the Act. Specifically, the Board held that retention of a substantial right of control, even where there was no direct evidence that such control was exercised, was sufficient to impose liability as an operator for purposes of the Act. The Director argued that Elliot had the right, after June 30, 1973, to exert substantial control over mining operations on its own coal lands under the terms of the leases or subleases described earlier and therefore was a "responsible operator" liable for benefits to its own former employees. *See* 20 C.F.R. § 725.491(a), (b)(4). The Director also argued that Elliot was an operator under the Act because it employed Kanour as a miner after June 30, 1973. *See* 20 C.F.R. § 725.-491(a) ("It is Congress' intent that any employer of a miner ... shall ... be considered an operator for purposes of this [Act]....").

An ALJ found that the leases and subleases were arms-length transactions and that Elliot, as lessor, did not have the substantial right to exercise control and supervision that

---

9. Part C of the Act governs all claims filed after January 1, 1974. 30 U.S.C.A. §§ 931–945. They are administered by DOL. Under Part C, benefits are paid either by a responsible coal mine operator or, where no putative responsible operator can be identified, by the Black Lung Disability Trust Fund.

Part B governed all claims filed on or before June 30, 1973. *See* 30 U.S.C.A. §§ 924a, 921–925. Such Part B claims were filed with and adjudicated by the Social Security Administration, and benefits were paid to eligible claimants out of general federal revenues. Kovalchick had previously been awarded disability benefits under Part B.

Claims filed between July 1, 1973 and December 31, 1973 are transition claims and are adjudicated by DOL pursuant to 30 U.S.C.A. § 925.

10. Because the deadly disabling symptoms of black lung disease are a result of the accumulated effect of long exposure to the hazards of the dust raised in coal mining operations, often with many employers, the phrase "responsible operator" does not imply any particular operator caused the disease in any particular claimant. Instead, it simply denotes the mining company on whom the law has elected to impose liability for the disabling consequences of a miner's exposure to the risk of black lung which is endemic to coal mining.

11. The reader is reminded that only persons who continued to "operate" coal mines after June 30, 1973, remain responsible for black lung benefits to former miners they employed between January 1, 1970, the effective date of the Federal Coal Mine Health and Safety Act of 1969, and June 30, 1973. *See* 20 C.F.R. § 725.491(b)(4) (defining "responsible operator"); *see also* n. 3 *supra*.

existed in *Long.* He therefore concluded *Long* was not controlling. *Yebernetsky v. Elliot Coal Mining Co.,* BRB No. 84–2560 BLA 5 (Oct. 19, 1984) ("*Yebernetsky I* "). He also found that Matia was an office worker, not a miner, and that Kanour was not in and around the mines enough to meet the Act's situs requirement for status as a coal miner. *Id.* Because Elliot had ceased its own mining operations before June 30, 1973, had no substantial power to control its lessees' and sublessees' independent mining operations, and did not employ any miners after that date, the ALJ held that Elliot was not a responsible operator. *Id.*

The Director appealed to the Board. On June 30, 1988, the Board held that its decision in *Long* was controlling because Elliot's leases included substantially the same legal rights to supervise its lessees and sublessees as the leases present in *Long* had given the lessor. *Yebernetsky II,* BRB No. 84–2560 BLA at 7–9. The Board therefore reversed ALJ Stratton's finding that Elliot was not a responsible operator and remanded the case for consideration of the claimants' entitlement. *Id.* at 9. According to the Board, Elliot satisfied all of 20 C.F.R. § 725.-492(a)(2)'s criteria for the status of a responsible operator liable, as in *Long,* for black

lung benefits due its former employees. The Board's conclusion that Elliot continued to operate after June 30, 1973, made it unnecessary for it to consider the Director's alternate argument that Elliot was an operator after June 30, 1973, because it employed Kanour as a "miner" after that date. *Id.*

After remand, it was determined that Kovalchick was entitled to benefits. The Board then entered a final order affirming that decision, and Elliot ultimately filed this petition for review on July 23, 1992.[12]

## III. *Jurisdiction and Standard of Review*

■ We have jurisdiction to review the Board's final order affirming ALJ Tierney's award of benefits under § 21(c) of the Longshoremen's and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C.A. § 921(c) (West 1986), incorporated into the Black Lung Benefits Act by 30 U.S.C.A. § 932(a) (West 1986). *See Harmar Coal Co. v. Director, OWCP,* 926 F.2d 302, 308 (3d Cir. 1991).

■ The Board has jurisdiction to review final decisions of an ALJ under § 21(b)(3) of the LHWCA, 33 U.S.C.A. § 921(b)(3) (West 1986), also as incorporated by 30 U.S.C.A. § 932(a). The Board is bound by an ALJ's

12. The history of the case following the Board's reversal of the ALJ's finding that Elliot was not a responsible operator is somewhat convoluted. Elliot first sought our review of that order in a petition for review filed December 22, 1988. We dismissed it on May 19, 1989 as interlocutory. *Elliot Coal Mining Co., Inc. v. Director, OWCP,* No. 88–3833 (3d Cir. May 19, 1989) (judgment order). All sixteen cases involving Elliot's post–1969 former employees were then remanded to the ALJ for consideration of the merits of the respective miners' medical entitlement to benefits. On remand before ALJ Tierney, Elliot stipulated that Kovalchick was totally disabled due to pneumoconiosis and was medically entitled to benefits under the Act but preserved its contention that it was not a responsible operator.

On January 28, 1991, ALJ Tierney concluded that he was bound by the Board's resolution of the responsible operator issue and awarded benefits to Kovalchick, designating Elliot the responsible operator and so directing it to pay Kovalchick's benefits. *Kovalchick v. Elliot Coal Mining Co.,* No. 81–BLA–7807, 1991 BLA LEXIS 209 (Jan. 28, 1991). The ALJ subsequently amended his order twice to correct technical errors, first to omit the award of augmented benefits to the

miner's wife, and second to award medical benefits only to the miner. These amendments do not affect this appeal. *Kovalchick v. Elliot Coal Mining Co.,* No. 81–BLA–7807, 1991 BLA LEXIS 745 (May 14, 1991); *Kovalchick v. Elliot Coal Mining Co.,* No. 81–BLA–7087, 1991 BLA LEXIS 666 (May 6, 1991).

On June 12, 1991, Elliot filed its own appeal with the Board. Contemporaneously it filed a petition for review with this Court. The Board held the appeal in abeyance pending our ruling on the petition for review. *Kovalchick v. Elliot Coal Mining Co.,* BRB No. 91–1528 (August 9, 1991) (order). On February 12, 1992, this Court dismissed the second petition for review as interlocutory. *Elliot Coal Mining Co. v. Director, OWCP,* 956 F.2d 448 (3d Cir.1992) (holding that 33 U.S.C.A. § 921(c) does not grant court of appeals jurisdiction to review final order of ALJ upon which Board has not yet passed).

The case then went back to the Board for its review of ALJ Tierney's decision. In a decision and order issued May 27, 1992, the Board reaffirmed its earlier holding that Elliot was the responsible coal mine operator and so affirmed ALJ Tierney's award of benefits to Kovalchick. *Kovalchick v. Elliot Coal Mining Co.,* BRB No. 91–1528 BLA (May 27, 1992).

findings of fact if they are rational, supported by substantial evidence, and consistent with applicable law. 33 U.S.C.A. § 921(b)(3); see O'Keeffe v. Smith, Hinchman & Grylls Associates, Inc., 380 U.S. 359, 362, 85 S.Ct. 1012, 1014–15, 13 L.Ed.2d 895 (1965).

We review the Board's decision for the limited purpose of determining whether it committed an error of law, but a Board decision dependent on a ruling which sets aside findings of an ALJ that are supported by substantial evidence is legally erroneous. See Hillibush v. United States Dept. of Labor, Benefits Review Bd., 853 F.2d 197, 202 (3d Cir.1988); Curtis v. Schlumberger Offshore Serv., 849 F.2d 805, 806–08 (3d Cir. 1988). The key issue is whether Elliot did have a substantial right to control its lessees' and sublessees' mining operations. If the statute and regulations make every lessee's reservation of the right to demand a minimum tonnage or royalty, coupled with a right to monitor production and a right of re-entry for breach of condition or broken "operation," a reservation of a right to control the coal mining operations of others within the meaning of § 802(d) and the Secretary's regulations implementing it, the decision of the Board must be affirmed. If neither the statute, the regulations, nor any consistent, plausible interpretation the Secretary or the Director has adopted under them necessarily brings Elliot within the definition of responsible operator, the question of control resolves itself into a question whether the ALJ's decision that Elliot did not have any substantial power to control mining operations after June 30,ʼ 1973, is supported by substantial evidence on the whole record. See Kowalchick v. Director, OWCP, 893 F.2d 615, 619 (3d Cir.1990); Curtis, 849 F.2d at 807–08 (citing Oravitz v. Director, OWCP, 843 F.2d 738, 739 (3d Cir.1988)).

■ The threshold question, whether Elliot's retention of these rights makes it an "operator" as a matter of law, is a question of statutory construction that includes both the interpretation and application of legal precepts, such as the definition of "operator." In that respect, this Court's review is plenary. We also have plenary review over the interpretation and application of the defini-

tion of "miner." See Hanna v. Director, OWCP, 860 F.2d 88, 91 n. 6 (3d Cir.1988) (plenary review exercised over Board's determination that claimant was "miner" because it was based on erroneous interpretation of Act); see also Director, OWCP v. Barnes & Tucker Co., 969 F.2d 1524, 1527 (3d Cir.1992) (plenary review with respect to questions of law). Though our review of this legal issue is plenary, our construction of the statute and regulations must be made with deference to the meaning the regulatory authority charged with administering the law has given a statute in its regulations or other consistent exposition of its meaning. See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843–44, 104 S.Ct. 2778, 2782–83, 81 L.Ed.2d 694 (1984).

■ It is clear that the Board is not the regulatory body whose decisions are entitled to judicial deference, but there is division among the courts of appeals on whether the Director's interpretation of the statutes he administers, as opposed to the Secretary's, is entitled to deference. We recognized that division of authority in Cort v. Director, OWCP, 996 F.2d 1549, 1551–52 n. 4 (3d Cir. 1993) (citing Liberty Mut. Ins. Co. v. Commercial Union Ins. Co., 978 F.2d 750, 757 (1st Cir.1992) (citing cases)). Indeed, our own case law is not entirely clear on this point. Prior to Chevron, we had held that the Director's interpretation is not owed "great deference." Id. at 1552 n. 4 (quoting Director, OWCP v. O'Keefe, 545 F.2d 337, 343 (3d Cir.1976)). In Barnes, we stated that "[w]e owe such deference to the Director, not to the Board, for the Director makes policy under the Black Lung Act." Barnes, 969 F.2d at 1527 (citing Director, OWCP v. Mangifest, 826 F.2d 1318, 1323 (3d Cir.1987)); see also Bethlehem Mines Corp. v. Director, OWCP, 766 F.2d 128, 130 (3d Cir.1985). In Barnes, however, we also stated that "we will not defer to an 'interpretation' in an adversary proceeding that strains 'the plain and natural meaning of words in a standard,' ... nor will we give deference to an interpretation of a regulation that implies language that does not exist in the regulation." Barnes, 969 F.2d at 1527 (citation omitted);

*see also Mangifest,* 826 F.2d at 1323–24.[13] In any event, because the Director is merely a delegatee of the Secretary, we conclude that the Secretary's interpretation of the Act must prevail over the Director's if the two are in conflict.

## IV. *Statutory History of the Federal Black Lung Benefits Program*

The question whether Elliot is a responsible operator within the meaning of the statute and regulations, and so liable for payment of any black lung benefits its former miners are entitled to, requires some preliminary consideration of the statutory history of the federal black lung benefits program. We begin with the 1969 act and its amendments.

This Court set forth the legislative history of the federal black lung benefits program in detail in *Helen Mining Co. v. Director, OWCP,* 924 F.2d 1269, 1271–73 (3d Cir.1991). We repeat here only so much of that history as is essential to an understanding of this case.

The black lung program stems from Title IV of the Federal Coal Mine Health & Safety Act of 1969, Pub.L. No. 91–173, 83 Stat. 742 (1969) (the "1969 Act") (effective December 30, 1969).[14] Congress enacted Title IV because it recognized the economic and social problems that the many coal miners and their families who were seriously affected by pneumoconiosis suffered. Pneumoconiosis is a deadly respiratory disease peculiar to coal miners, popularly known as black lung disease. Congress created the black lung program because it felt that the states had failed to adopt programs adequate to alleviate the suffering among miners disabled by black lung disease and the destitution visited on their dependents. *See generally* Allen R. Prunty & Mark E. Solomons, *The Federal Black Lung Program: Its Evolution and Current Issues,* 91 W.Va.L.Rev. 665 (1989).

Initially, benefits were paid from public funds, but Congress thought that responsibility for the benefits many would claim would in due course be taken over by the states under improved state black lung programs Congress hoped the 1969 Act would encourage. Thus, under Part B of the 1969 Act, claims filed on or before December 31, 1972 were to be processed by the Social Security Administration ("Social Security") and paid from the federal fisc. DOL was to handle all claims for black lung benefits filed "on and after January 1, 1973." They were called Part C claims. Kovalchick's claim is a Part C claim. In 1969 Congress assumed that it would be paid from state or private funds in accord with the yet to be enacted "adequate" state workers' compensation statutes Congress expected to spring up to meet the perceived serious problems of death, disability and destitution in the nation's coal towns. If a particular state's program proved inadequate under DOL regulations, DOL was directed to instruct the mine operators who had employed the afflicted miner, or their successors, that they were to pay or be responsible for benefits due that state's coal miners. If the operator who had employed the miner or a successor could not pay or be found, then the federal government was to secure the claim. Pub.L. No. 91–173, §§ 411(a), 422(a)–(d), 83 Stat. 742, 796 (codi-

13. On the deference generally due the Secretary of Labor's interpretation of the Act, *see Mullins Coal Co. v. Director, OWCP,* 484 U.S. 135, 159, 108 S.Ct. 427, 440, 98 L.Ed.2d 450 (1987); *Chevron,* 467 U.S. at 843–45, 104 S.Ct. at 2782–83. In addition, we must "defer to an agency's consistent interpretation of its own regulations unless it is 'plainly erroneous or inconsistent with the regulation.'" *Barnes,* 969 F.2d at 1527 (quoting *Mangifest,* 826 F.2d at 1323 (quoting *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945))).

On the absence of any deference to the Board, *see Pauley v. BethEnergy Mines, Inc.,* 501 U.S.

680, ——, 111 S.Ct. 2524, 2534, 115 L.Ed.2d 604 (1991) (indicating that judicial deference is due administrative agency interpretation only when Congress has expressly delegated such authority). Neither Congress nor the Secretary has delegated any regulatory power to the Board. Thus, the Board's decision in *Long,* on which the Director relies, is not binding on us because the Board, as an adjudicatory tribunal, has no authority either to make rules or formulate policy and its interpretation of the Act or the regulations receives no special deference. *See Barnes,* 969 F.2d at 1527; *Bethlehem Mines,* 766 F.2d at 130.

14. In 1978, Title IV of the 1969 Act was named the "Black Lung Benefits Act," Pub.L. No. 95–239, § 16, 92 Stat. 105 (1978).

fied at 30 U.S.C.A. § 921(a), 932(a)–(d) (1970)).

The 1969 Act created several presumptions to aid claimants in establishing entitlement, but the black lung program soon came under fire because many former miners were unable to secure evidence of employment in the nation's coal mines for a long enough time to meet presumptive standards on the cause and presence of disabling pneumoconiosis. *See* S.Rep. No. 743, 92d Cong., 2d Sess., *reprinted in* 1972 U.S.C.C.A.N. 2305, 2313–20. These criticisms resulted in the first of three sets of amendments.

The Black Lung Benefits Act of 1972, Pub.L. No. 92–303, 86 Stat. 150 (1972) (the "1972 Act"), liberalized eligibility criteria, expanded the scope of coverage, extended the government's responsibility for payment of benefits by continuing coverage under Part B to June 30, 1973, and continued Part C in existence until December 30, 1981. It was made retroactively effective to December 30, 1969. Pub.L. No. 92–303, § 3(c). It failed, however, to halt criticisms from either the miners and their partisans or the coal companies.

Thus, on March 1, 1978, Congress enacted the Black Lung Benefits Reform Act of 1977, Pub.L. No. 95–239, 92 Stat. 95 (1978) (codified at 30 U.S.C.A. §§ 901 *et seq.*) (the "Reform Act") (effective March 1, 1978). The Reform Act again liberalized the standards for entitlement and continued Part C indefinitely. *See Helen Mining Co.*, 924 F.2d at 1272. Under the Reform Act, Social Security and DOL were told to review all 1973 claims still pending or previously denied and apply the Reform Act's liberalized standards to them. Pub.L. No. 95–239 § 15, 92 Stat. 103–04; *see also Republic Steel Corp. v.*

*United States Dep't of Labor*, 590 F.2d 77, 79 (3d Cir.1978). Recognizing the economic problem this could create for the coal companies that had once employed these men, Congress created a new means of securing payment for some of the revived and pending Part C claims in a related act, The Black Lung Benefits Revenue Act of 1977, Pub.L. No. 95–227, 92 Stat. 11 (1978) (codified at 26 U.S.C.A. § 4121 *et seq.*) (the "Revenue Act") (effective March 1, 1978). The Revenue Act created the Trust Fund. Pub.L. No. 95–227 § 3, 92 Stat. 12. The Trust Fund, financed by an excise tax on each ton of coal mined and sold after March 31, 1978, was to pay the continuing administrative costs of the black lung benefits program, cover the federal government's existing Part C liability for benefits attributable to mine operators who could not pay or be found,[15] and "assume responsibility for paying black lung benefits where a miner's last employment in the industry ceased before January 1, 1970, thus shifting to the Fund responsibility for Part C claims made by miners who had stopped working in the coal industry before the promulgation of the 1969 Act." *Helen Mining Co.*, 924 F.2d at 1272; *see also* 26 U.S.C.A. § 9501(d) (West 1989).

■ With this background in mind, we turn to an analysis of the three issues presented in this case: whether Elliot is an operator liable for benefits to its former employees because (1) the statutory definition of "operator" includes any "owner" or "lessee" regardless of whether or not it "operates, controls, or supervises" a coal mine;[16] (2) assuming Elliot as owner/lessor[17] must operate, control, or supervise the coal mine, whether it was nevertheless an operator because it possessed a sufficient degree of con-

---

15. As we have said, Elliot does not dispute claimant's entitlement to benefits. The only issue is whether Elliot is a responsible operator liable for the payment of the awarded benefits to its own former employees; if not, the Trust Fund will be responsible for them.

16. The Director did not raise this statutory construction argument—that an owner or lessee of coal lands is automatically an operator regardless of the lack of retention of control—in the administrative proceedings. It is nevertheless open to our consideration on this appeal as an

alternate theory on which the decision of the Board could be affirmed. *See Helvering v. Gowran*, 302 U.S. 238, 245, 58 S.Ct. 154, 157–58, 82 L.Ed. 224 (1937); *see also University of Maryland v. Peat Marwick Main & Co.*, 923 F.2d 265, 275 (3d Cir.1991); *Laird v. Shell Oil Co.*, 770 F.2d 508, 511 n. 6 (5th Cir.1985).

17. Because Elliot owned some of the mines it operated before June 30, 1973, but leased others, it was, after June 30, 1973, in some cases a lessor and in others a sublessor as well as a lessee.

trol or supervision over the mines in question through the rights it retained in its lease and sublease agreements; or, alternately, (3) whether it employed a "miner" after June 30, 1973.

## V. *Analysis*

### A. *Who is an "Operator" Under the Act*

The Act imposes liability for the payment of black lung benefits on coal mine operators who meet specified statutory and regulatory criteria. It defines an "operator" responsible for the payment of benefits at Section 3(d):

For the purposes of this [Act], the term—

\* \* \* \* \* \*

"operator" means any owner, lessee, or other person who operates, controls, or supervises a coal or other mine or any independent contractor performing services or construction at such mine....

30 U.S.C.A. § 802(d) (1986); *see also* 20 C.F.R. §§ 725.101(a)(27), 725.491 (1992) (defining operator in accordance with § 3(d) of Act); *National Indus. Sand Assoc. v. Marshall*, 601 F.2d 689, 700 (3d Cir.1979). Thus, operators were defined, in both the Act and the regulations, as "any owner, lessee, or other person who operates, controls, or supervises a coal or other mine...." 30 U.S.C.A. § 802(d); 20 C.F.R. §§ 725.-101(a)(27), 725.491. DOL has conceded that not all owners are "responsible operators":

The Department agrees that not all owners of coal lands or mineral rights could be found to be liable coal mine operators. Each case must be determined on the basis of its own facts measured against the requirements of the act.

43 Fed.Reg. 36,772, 36,803 (Aug. 18, 1978). The Director nevertheless argues that the term "operator" should be read to embrace three distinct entities: (1) an "owner" of a coal mine; (2) a "lessee" of a coal mine; and (3) any "other person who operates, controls, or supervises" a coal mine. According to the Director, the status of owner or lessee is sufficient in and of itself to make an owner or lessee an operator under the text of the statute. Thus, the Director asserts that the liability of an "owner" or "lessee," unlike the liability of any "other person," is not contingent on the additional statutory criteria of operating, controlling or supervising. The Director argues that its interpretation of the term "operator" follows from basic principles of statutory construction; otherwise, he says, use of the terms "owner" and "lessee" would be meaningless because they would be included within the phrase "other person who operates, controls or supervises."

#### 1. *The Statutory Text of § 3(d)*

In analyzing the Act's text, "we assume 'that the legislative purpose is expressed by the ordinary meaning of the words used.'" *Air Courier Conference v. United States Postal Serv.*, 959 F.2d 1213, 1217 & n. 3 (3d Cir.1992) (quoting *American Tobacco Co. v. Patterson*, 456 U.S. 63, 68, 102 S.Ct. 1534, 1537, 71 L.Ed.2d 748 (1979)). If the Act's meaning is plain from the text, our job is done, because "judicial deference to an agency's construction of a statute in conflict with the statute's plain meaning would be inappropriate." *Id.* at 1224.

In applying these principles, we first consider the statute from a grammatical standpoint. The clause in § 3(d) introduced by the relative pronoun "who" is an adjective clause which modifies one or more of the series of nouns that precedes it. Whether it modifies only "other person," the last noun or substantive phrase in the series, or the entire series of nouns including "owner" and "lessee" is the syntactical question before us. In making his argument, it seems to us the Director must rely on the grammatical principle or "doctrine of the last antecedent." Under that principle, "qualifying words, phrases, and clauses are to be applied to the words or phrase immediately preceding, and are not to be construed as extending to and including others more remote." *Azure v. Morton*, 514 F.2d 897, 900 (9th Cir.1975); *see United States ex rel. Santarelli v. Hughes*, 116 F.2d 613, 616 (3d Cir.1940) (contrary "construction flies in the face of common sense in grammar hardened into law"); 2A Norman J. Singer, *Sutherland Statutory Construction* § 47.33 (5th ed. 1992). The punctuation of this section indicates, howev-

er, that the doctrine of the last antecedent does not apply to the limiting relative clause in § 802(d).

The first two nouns in the series, "owner, lessee," are not only separated by a comma, *inter se*, but are also separated from the general term "other person" by a comma before the conjunction "or." Under the normal rules of English punctuation for words in a series, it is the absence of a comma or other punctuation before the coordinate conjunction "or" that would indicate it and its modifier, the limiting adjective clause, are to be treated separately rather than as part of the whole series. *See The Gregg Reference Manual* at 35 (7th ed. 1993); *see also* 1A *Sutherland Statutory Construction* § 21.15. Conversely, the presence of a comma before the last clause in the statute suggests that the limiting clause applies to the entire series.

This use of a comma to set off a modifying phrase from other clauses indicates that the qualifying language is to be applied to all of the previous phrases and not merely the immediately preceding phrase. *Cf. National Sur. Corp. v. Midland Bank*, 551 F.2d 21, 34 (3d Cir.1977) (lack of a comma limited application of the qualifying language to the word immediately preceding it). If Congress intended to define operator in the way the Director argues, it should not have inserted a comma before the word "or"; alternately perhaps it could have said: " 'operator' means any owner [of], lessee [of], or other person who operates, controls, or supervises[,] a coal or other mine. . . ."

If we read the clause "who operates, controls or supervises a coal or other mine" to modify just the catch-all phrase "other person," all owners or lessees would be operators without regard to what they own. The statute would read "operator means any owner [or] lessee . . ." without limitation to owners or lessees of coal mines. The dependent clause "who operates, controls or supervises" cannot be sensibly read to modify only "other person." The Director's suggestion is bad grammar and leaves no logical connection between "owner" or "lessee" and "mine." Accordingly, the punctuation and syntax of § 3(d) indicates that the "doctrine of the last

antecedent" does not help the Director in this case.

The Director's construction of § 3(d) invites us to take a distorted view of the statutory language—one separating "owner" and "lessee" from "other person" instead of recognizing all three belong in one category which is distinguished from a second, namely, "independent contractor." This distortion is made clearly apparent by the regulatory definition of "operator" which was promulgated after the 1977 amendments to the statute. That regulation provides:

> "Operator" means any owner, lessee, or other person who operates, controls or supervises an underground mine; or any independent contractor identified as an operator performing services or construction at such mine.

30 C.F.R. § 48.2(e) (1992); *see also infra* n. 19. The semi-colon between the two categories is particularly striking.

For these reasons, we also think the Director's reliance on *Association of Bituminous Contractors, Inc. v. Andrus*, 581 F.2d 853 (D.C.Cir.1978), is misplaced. In holding that a mine could have more than one operator, the court stated:

> There is always an owner of a coal mine, yet the statute includes lessees and "other persons" within the definition of operator as well. So there must be some cases where the person who operates, controls, or supervises is not the owner. In those cases, the definition of operator must encompass the owner *and* such other person. The district court supports its conclusion that only one person could be an operator by reading the clause "who operates, controls, or supervises a coal mine" to apply to "owner," "lessee" *and* "other person." If that were the correct reading, the specification of owner and lessee would then be superfluous. The statute could merely have read " 'operator' means any person who operates, controls, or supervises a coal mine."

*Id.* at 862 (emphasis in original). We do not read "owner" and "lessee" to be superfluous; they are merely examples of entities or indi-

viduals that fall within the nonexclusive definition of "operator."

*Andrus* did not concern an owner or lessee's liability for black lung benefits due a former employee but instead addressed whether an independent construction company that was actually engaged in constructing a new tunnel shaft at a mine, as well as the owner of the coal mine, could be held liable for the construction company's safety violations. The court of appeals in *Andrus* held that the definition of "operator" as "other person" could include independent contractors who operate, supervise or control a coal mine, and that in such a case, the independent contractor and the land owner would *both* be responsible for payment of fines levied for violation of the safety regulations. *Id.* at 862–63; *see also Cyprus Indus. Minerals Co. v. Federal Mine Safety & Health Review Comm'n*, 664 F.2d 1116, 1118–19 (9th Cir.1981) (both owner and independent contractor liable for safety violations of independent contractor).

*Andrus* might be distinguished on this functional basis. It concerned responsibility for safety measures and therefore was decided without regard to the effect of the 1977 Amendments to the Black Lung Benefits Act or the Reform Act. *See Bituminous Coal Operators' Ass'n, Inc. v. Hathaway*, 406 F.Supp. 371, 375 (D.C.Va.) (in light of different remedial purposes of the subchapters of this chapter, construction placed on particular definitions in one subchapter cannot be mechanically applied to all subchapters), *aff'd*, 547 F.2d 240 (4th Cir.1975).

▆▆▆▆ We understand that syntax and grammatical rules do not completely control issues of statutory interpretation. *See Longview Fibre Co. v. Rasmussen*, 980 F.2d 1307, 1311 (9th Cir.1992). Still, additional support for our parsing of the text of the Act, insofar as it concerns liability for black lung benefits, can be found in the "mischief" rule, discussed in the venerable *Heydon's Case*, 76 Eng.Rep. 637 (Ex.1584). That canon of construction directs a court to look to the "mischief and defect" that the statute was intended to cure. *Id.* at 638. Here, the legislative history of the 1977 Amendments to the Act and the Secretary's own comments concerning them

indicate that the statute was aimed at those who sought to avoid liability by a quick change of corporate garb that served only to disguise the economic identity of the mining company which continued to benefit from the mining operations.

Accordingly, we do not believe the statute itself can be read to mean that all persons who owned or leased coal bearing property after June 30, 1973, are operators who are responsible for black lung benefits due their former employees. We reject, as contrary to the plain meaning of the statute, the Director's interpretation of § 802(d)'s text as imposing liability on all owners of coal lands worked by others without regard to whether the owner or lessee is itself an operator who has retained some right to control or supervise others' mining operations on lands they own or lease.

### 2. The Legislative History Specific to § 3(d) and the Secretary's Comments on It

Our reading of the statutory text defining "operator" is also supported by its specific legislative history. The Senate reports state that the term "operator" includes "any individual, organization, or agency, whether owner, lessee or otherwise, that operates, controls, or supervises a coal mine, either directly or indirectly." 115 Cong.Rec.S. 39,985 (daily ed. December 18, 1969) (analysis of Federal Coal Mine Health and Safety Act of 1969 by Subcommittee on Labor of the Committee on Labor and Public Welfare of the United States Senate); *see also* S.Rep. No. 411, 91st Cong. 1st Sess. 48 (1969).

In considering the meaning of the phrase "operator," the Secretary has commented extensively on the legislative history of the 1977 Amendments. In those comments, the Secretary has noted that Congress intended to prevent businesses from escaping liability for black lung benefits by a change of corporate form or identity that had no substantial economic effect on the power to control the exploitation of the mineral resources. She said:

> The 1977 amendments to the black lung provisions of the Act were motivated in

significant part by the inability of the Secretary of Labor to assess coal operator liability in the vast majority of part C claims under the then existing law. This difficulty was caused primarily by the many and intricate corporate changes which characterized business in the coal industry during the late 1950's and 1960's. During this time, many large and medium size coal operators terminated their own mining operations, diversified their interests and began leasing their coal land to other operators both large and small. Many claims were received from the former employees of coal operators turned lessors, and the Department experienced considerable difficulty in assessing liability against these businesses.

In response to the difficulties encountered by the Department in assessing operator liability in lessor cases, as well as many other cases involving corporate changes, Congress established the coal tax and Black Lung Disability Benefits Trust Fund, terminating Federal liability for black lung claims, and significantly amended section 422(i) of the Act *to clearly require the payment of benefits by an operator which had undergone substantial corporate changes.* In order to decrease the burden on operators and former operators, the Act established that liability would not be imposed on an operator if the miner's last employment with the operator occurred before January 1, 1970.

While the cutoff date would absolve most coal lessors of liability for their former miners, the lessor problem remained. Accordingly, in the development of the revised section 422(i), the Senate report contained the following language: *"In addition, a number of business entities which previously engaged in extensive coal mining operations, although no longer directly involved in the extraction of coal, still derive substantial revenues from the leasing of coal properties * * *. It was originally the intent of Congress that such entities should bear the liability for each lung disease arising out of employment in their*

*mines."* The explanation of section 422(i)(2) provides, "It is the intention of this section to require the payment of benefits by the prior operator where, for example, such operator now derives revenues from the leasing of coal mines * * *." [ ]. The Senate amendments to section 422(i) were adopted by the Conference Committee unchanged. There can be little doubt that Congress confirmed the view held by the Department concerning the potential liability of *certain* lessors.

43 Fed.Reg. 36,772, 36,803 (Aug. 18, 1978) (emphasis added and citations omitted). The Senate Report to which the Federal Register discussion refers does evidence Congress's intent to prevent coal operators from evading liability by shifting corporate form. *See* S.Rep. No. 209, 95th Cong., 1st Sess. 8–9 (1977). It stated that under the 1977 Amendments business entities no longer directly involved in coal extraction would still be liable for benefits to their former employees if they derived substantial revenues from the leasing of coal properties. *Id.*

DOL has thus stated, in response to comments arguing that use of the term "lessee" in § 3(d) precludes the assessment of liability against a lessor, that "[t]he definition [of operator] extends to any owner or other person who 'operates, controls or supervises a coal mine,' " and moreover, that such "control may be established either 'directly or indirectly.' " 43 Fed.Reg. at 36,803. "It is the opinion of the Department that a lessor of coal mines is an owner of a coal mine and, *depending upon the facts of each case,* may, either directly or indirectly, supervise and control the lessee's mining of coal." *Id.* (emphasis added).[18]

### 3. *The Regulations Relating to § 3(d)*

In accordance with its statutory authorization, DOL promulgated the regulations found at 20 C.F.R. Part 725, Subpart F entitled "Responsible Coal Mine Operators." Under it, mining companies were relieved of responsibility for payment of benefits to miners

---

**18.** This is not entirely consonant with the common law of Pennsylvania concerning the nature of a lessee's property rights in coal in place. *See* n. *8 supra. Of* course, we recognize it is federal, not state, law that governs.

they had employed after December 31, 1969, if, but only if, they ceased "operating" coal mines by June 30, 1973. In those regulations, the Secretary herself defines "operator" as follows:

### § 725.491 Operator defined.

(a) In accordance with section 3(d) of the Act, an operator for purposes of this part is "any owner, lessee or other person who operates, controls, or supervises a coal mine or any independent contractor performing services or construction at such mine...."

20 C.F.R. § 725.491(a) (1992). It will be seen at once that this regulation tracks the language of § 3(d) of the Act verbatim except for its elimination of the comma after lessee.[19]

Other succeeding provisions of the regulations concerning operators give no clear indication that the Secretary, as opposed to her subordinate, the Director, interprets § 3(d) of the Act to impose a *per se* liability on all owners and lessees who grant others the right to extract coal from lands they own outright or from lands on which they hold the right to extract the coal in place. Section 725.491(b)(2) relates to a lessor's responsibility for claims made by employees of the lessee. It clearly imposes liability on lessors who possess or retain the right to control certain aspects of the lessee's mining operations, but it does so in permissive terms that seem to negate any *per se* rule. It reads:

(b)(2) *Where a coal mine is leased, and the lease empowers the lessor to make decisions with respect to the terms and conditions under which coal is to be extracted or prepared, such as, but not limited to, the manner of extraction or preparation or the amount of coal to be produced, the lessor may be considered an operator with respect to employees of the lessee.* An individual land owner or others who lease coal lands or mineral rights, who have never been coal mine operators or are not in the regular business of leasing coal mines, shall not be considered a coal mine

operator in accordance with the terms of this section. Where a lessor previously operated a coal mine, it *may* be considered an operator with respect to employees of any lessee of such mine, particularly where the leasing arrangement was executed or renewed after the effective date of this part and does not require the lessee to secure benefits provided by the Act.

*Id.* § 725.491(b)(2) (emphasis added). Subsection (b)(3) also relates to a lessor's secondary liability for black lung benefits due its lessee's employees. It too requires a case-by-case determination of responsibility dependent on the facts of each case. It provides:

(b)(3) *In any claim in which the liability of a lessor for claims arising out of employment with a lessee is brought into question, the lessee shall be considered primarily liable for the claim,* and the liability of the lessor may be established only after it has been determined that the lessee is unable to provide for the payment of benefits to a successful claimant. In any case involving the liability of a lessor for a claim arising out of employment with a lessee, any determination of lessor liability shall be made on the basis of the facts present in the case in consideration of the terms and intent of the act and this part.

*Id.* § 725.491(b)(3) (emphasis added).

Elliot's liability to its own former employees, such as Kovalchick, who worked after January 1, 1970, the effective date of the original Act, is, however, based on subsection (b)(4). It reads, in pertinent part:

(b)(4) A former coal mine operator which has become a lessor of coal miner [sic] shall be liable for approved claims arising out of coal mine employment with such lessor during the time the lessor was a coal mine operator, if such employment terminated on or after January 1, 1970, and the conditions for liability contained in § 725.492 are met.

*Id.* § 725.491(b)(4). Subsection (b)(4) does not specifically refer to the language of

---

19. *But see* Part V.A.1. *supra.* This omission of the comma at the point it occurs in this series is not necessarily significant. It may be a natural result of the regulatory addition of a new sub-class the statute does not contain, *i.e.,* "independent contractors," at the end of the series instead of before the general class of "other persons."

§ 3(d) limiting the class of owners or lessees who are subject to liability for black lung benefits to those who continue to operate, supervise or control mining operations that others conduct on their coal lands after June 30, 1973. Instead, § 725.491(b)(4) refers us by cross-reference to the conditions of liability set out in § 725.492. Section 725.492 provides, in pertinent part:

§ 725.492 **Responsible operator defined.**

(a) A "responsible operator" is the operator which is determined liable for the payment of benefits under this part for any period after December 31, 1973. In order for an employer to be considered a responsible operator in any case, the following shall be established:

(1) The miner's disability or death shall have arisen at least in part out of employment in or around a mine or other facility during a period when the mine or facility was operated by such operator, except as provided in § 725.-493(a)(2);

(2) *The operator shall have been an operator of a coal mine or other facility for any period after June 30, 1973;*

(3) The miner's employment with the operator or other employer shall have included at least 1 working day (§ 725.-493(b)) after December 31, 1969; and

(4) The operator or the employer shall be capable of assuming its liability for the payment of continuing benefits under this part, through any of the following means:

(i) By obtaining a policy or contract of insurance . . .; or

(ii) By qualifying as a self-insurer . . .; or

(iii) By possessing any assets that may be available for the payment of benefits. . . .

(b) In the absence of evidence to the contrary, a showing that a business or corporate entity exists shall be deemed sufficient evidence of an operator's capability of assuming liability under this part.

20 C.F.R. §§ 725.492(a), (b) (1992) (emphasis added). The parties to this dispute agree that the conditions for liability contained in

§ 725.492(a)(1), (a)(3), and (a)(4) are met. Thus, Elliot's liability to Kovalchick depends solely on whether it was "an operator of a coal mine . . . for any period after June 30, 1973" in accord with § 725.491(b)(4)'s incorporation of the conditions of § 725.492(a)(2). Because § 725.492(a)(2) does not expressly refer to an owner's or lessee's right to control, supervise or direct mining operations conducted on its coal lands after June 30, 1973, the Director contends that neither control, nor a right to control, play any part in determining whether an owner or lessee who grants another a right to mine coal on the owner's or lessee's lands is an "operator" responsible for the black lung benefits due its own former employees. In making that argument, the Director ignores the Secretary's use of the controlling word "operator" in § 725.492(a)(2), the definition of operator in § 725.491(a), and the statute's limitation of the liability of an owner or lessee of coal lands to those owners or lessees who retain rights to supervise, direct or control mining operations on their coal lands.

■ We begin with the word "operator." We assume that it should be given its normal meaning unless it is apparent the Secretary has given some artificial, technical meaning to it. The dictionary defines "operator" as follows: "[o]ne who works a business, undertaking, etc." *The Oxford English Dictionary* at 1996 (Compact ed. 1981); *see also The American Heritage Dictionary* at 871 (2d College ed. 1982) ("operator" is "[t]he owner or director of a business or industrial concern.").

The regulations do indicate that the word "operator" as used in § 725.492(a)(2) has been given its broad dictionary meaning in accord with the text of § 3(d) of the statute and the purpose behind the 1977 amendments to include owners or lessees who would not normally be thought of as "operators" of coal mines but for their retention of effective power to control, *i.e.*, direct, the extraction of coal from lands they had once mined. That expansion of meaning is shown in § 725.491(a)'s general definition of "operator." It, like § 3(d) of the Act, limits the owners, lessees or others who are classed as "operators" to those who retain "control"

over mining operations on their lands. We think, however, that the Director's even broader proposed interpretation which would include all "owners" as well as all "lessors" would reduce § 725.492 to the meaningless tautology that an operator is an operator—true but not helpful to analysis. Moreover, such an interpretation conflicts with the limiting clause of § 725.491(a)'s definition of operator—and the definition in the statute. Thus, to give meaning to § 725.492(a)(2), as § 725.491(b)(4) requires, our inquiry continues.[20]

If all owners were automatically included in the broader category of "operator," there would be no need for §§ 725.491(b)(4) and 725.492. Section 725.491(b)(4) requires the facts of each situation to be measured against the criteria of § 725.492. The Director's *per se* interpretation would render this regulatory cross-reference superfluous. The Secretary has specifically stated:

> Coal mine lessors are most likely to be former operators with extensive land or mineral rights holdings or other large commercial enterprises, and some of them have the capability to mine their own coal when conditions are favorable. *While few lessors exercise day-to-day control over their leased properties, standard coal leases frequently demand a specified level of production and royalties, and retain numerous rights for the lessor.*
>
> \*     \*     \*     \*     \*     \*
>
> [T]he revised section 422(i) of the act and the explanations of that section further clarify the potential liability of a lessor in the black lung benefits context of the act. It is the opinion of the Department that a lessor of coal mines is an owner of a coal

mine and, *depending on the facts of the case,* may, either directly or indirectly, supervise and control the lessee's mining of coal. *Actual day-to-day supervision and control is not required by the Act.*

43 Fed.Reg. at 36,803 (emphasis added).

In 1981, the Secretary published a proposed amendment to § 725.491(b)(2) which would have prevented certain coal mine lease terms such as minimum royalty and tonnage requirements, rights of inspection and approval, and reentry rights, from being used to establish that a coal mine lessor was an operator with respect to its liability for its lessees' employees. *See* 46 Fed.Reg. 8570 (proposed Jan. 27, 1981).[21] Comments in response to the proposed § 725.491 regulation registered substantial opposition to the provisions by which a lessor of a coal mine may be considered a coal mine operator liable for benefits to a lessee's employees, as well as opposition to a lessor's liability in general. The Secretary subsequently withdrew the proposal after receiving comments favoring continued case by case adjudication on the issue. *See* 52 Fed.Reg. 26,352 (July 14, 1987).

The Director argues that this amendment, if it had been effectuated, would have only affected lessors who were responsible under § 725.491(b)(2) for benefits to their lessees' employees, not lessors like Elliot who may be responsible for benefits to their own former employees under § 725.491(b)(4). We think, however, that the Director's *per se* argument cannot stand in the face of the language of § 3(d), the use of the word "operator" in Regulation § 725.492(a)(2) and Regulation § 725.491(a)'s definition of "operator."

---

**20.** Elliot argues that it ceased to operate its coal mines prior to June 30, 1973, and therefore it is not a responsible operator because the criterion of § 725.492(a)(2) requires actual operation or an effective control of operations and neither of those conditions are met on the facts of this case. The legislative history of the 1977 Amendments and the Secretary's comments concerning them indicate, however, that Elliot's argument that it is not responsible for any benefits due Kovalchick simply because it stopped operating its own coal mines before July 1, 1973 sweeps too broadly.

**21.** Section 725.491(b)(2) governs a coal mine operator's liability for the benefits due its lessees' employees. It requires a close look at the terms of the particular lease. It sets forth the conditions under which a lessor may be considered an operator with respect to employees of the lessee. Under this provision, where the lease empowers the lessor to make decisions with respect to the manner of extracting or preparing the coal, such as specifying minimum royalty and tonnage requirements, rights of inspection and approval and re-entry rights, the lessor may be responsible secondarily for the benefits to its lessee's employees.

The Director's argument that all owners, lessees and lessors are automatically responsible operators with respect to their own former employees without regard to supervision and control, like Elliot's equally simplistic argument that it is not liable if it is not actually an operator of coal mines within the dictionary definition of that word, proves too much. If accepted in the broad sense the Director advances it, every person who owned land from which they permitted others to mine coal after June 30, 1973, would be an operator responsible under § 3(d) for the payment of black lung benefits to any of their own employees who worked after December 31, 1969, under § 3(d). We do not think the Secretary's regulations go that far. Even *Long v. Bituminous Coal Corp.*, 1 BLR 1–149 (1977), the case decided prior to promulgation of the 1978 regulations on which the Director and the Board heavily rely, rejected this broad argument. Instead, *Long* required inquiry into the question of whether a former operator who becomes an owner/lessor before June 30, 1973, maintained a right to control the mining operations of its lessees through the terms of its lease agreements with them.

For all these reasons, the Director's *per se* argument seems contrary to the text of both the regulations and the statute which we think impose on lessors or owners liability for Part C claims of their own former employees who worked for them after January 1, 1970, only if the lessor or owner itself either continues to operate coal mines after June 30, 1973, or has the power to control the mining operations after that date and we so hold.

Because we hold that the Director's *per se* interpretation of the Act is contrary to the plain meaning of § 3(d) of the Act, as well as the Director's own regulations, it becomes necessary to determine whether Elliot had some substantial right or power to supervise, control, or operate a coal mine after the June 30, 1973, cut-off date in order to incur liability to its former employees. The question whether the lessor of coal mines supervises mining operations, either directly or indirectly, is expressly said to depend "on the basis of [the case's] own facts measured against

the requirements of the act." 43 Fed.Reg. at 36,803.

## B. *Supervision or Control Under the Leases From Elliot*

The question thus recurs. Did Elliot continue to be an operator because the terms of the leases that it entered into governing operations on its coal lands after June 30, 1973 gave it an effective power to control those operations?

### 1. *Long and the Right to Control*

On this question, the Director argues that even if a lessor must have "operated, supervised, or controlled" a coal mine after June 30, 1973 to be liable to its own former employees who worked as miners after December 31, 1969, the lease and sublease agreements Elliot made granting mining rights to the actual operators gave Elliot, as a matter of law, substantial power to control its lessees' mining operations. Thus, according to the Director, Elliot is a responsible operator who is liable for Kovalchick's black lung benefits.

Relying on *Long*, the Director argues that a substantial right of control is present whenever a lessor retains a right of reentry for breach coupled with a right to monitor production and require periodic payments of minimum royalties. Subject to any deference due the Secretary or the Director, our scope of review over the statute and regulations is plenary. As we have already explained, we need not defer to the Board's interpretation of the Act in *Long*. See *Barnes*, 969 F.2d at 1527. Thus, we will follow *Long* only to the extent we believe its reasoning is persuasive. Moreover, *Long* is distinguishable. There, the Board found that the leases were essentially contracts of adhesion. *Long*, 1 BLR at 1–168. In this case, there is no similar evidence that the leases were adhesive in nature.

Clearfield Bituminous Coal Corporation, the company the Board held responsible in *Long*, was a subsidiary of the New York Central Railroad formed to mine coal for the railroad's use. *Id.* at 1–150. In 1968, the New York Central and Pennsylvania Rail-

roads merged. *Id.* at 1–151. When the merged railroad's need for coal gradually diminished and eventually ceased, Clearfield systematically phased out its own direct coal mining operations. *Id.* It replaced them with a system of identical leasing arrangements which had many of the aspects of a contract of adhesion. *Id.* at 1–168. Under those leases, other firms undertook to operate Clearfield's mines and made rental and royalty payments directly to Clearfield.[22] *Id.* at 1–151. The Board held in *Long* that Clearfield had retained such substantial powers of supervision and control over its working mines that it came within the responsible operator provisions of the Act and regulations. *Id.* at 1–171. Thus, the Board held it liable for black lung benefits due any former employees who had worked for it as miners after December 31, 1969, and held that the ALJ erred in determining otherwise. *Id.* at 1–175. The regulations themselves incorporate much of the *Long* rationale with respect to owner and lessor liability for black lung benefits payable to miners employed after December 31, 1969.[23]

Accordingly, we believe *Long* is persuasive in holding as a principle of law that an actual exercise of control is not necessary. *Cf. id.* at 1–171 to 172. Therefore, we reject Elliot's argument that the Act and the regulations require actual operation, supervision or control and that the mere existence of an unexercised right to control cannot make a lessor or owner a responsible operator. To the contrary, we believe that the statute and the regulations impose liability for black lung benefits on mining companies who transfer the right to mine coal on lands they had once worked to subsidiaries or others over whose mining operations they have the power to exercise substantial, effective control.

■ In determining who is a "responsible operator" under the Act, we think some analogy to the National Labor Relations Board's framework for determining whether an individual is a "supervisor" within the meaning of Section 2(11) of the National Labor Relations

Act, 29 U.S.C.A. § 152(11) (West 1973), is not inappropriate. Supervisors include persons who have the power to make effective recommendations about employee disciplinary measures, not just those who carry them out. Under this analogy to section 2(11) of the NLRA, the validity of the Director's proposed *per se* litmus test for determining when a right of control exists is doubtful. *See NLRB v. Keystone Pretzel Bakery, Inc.,* 696 F.2d 257, 260 (3d Cir.1982) (in banc) (supervisor status is factual finding of ALJ that can only be overturned absent substantial evidence).

Moreover, in referring to the legislative history of the Black Lung Reform Act, the Secretary herself, as we have pointed out, has stated that the determination of who is a responsible operator must be determined on a case-by-case basis. *See* 43 Fed.Reg. at 36,803 ("Each case must be determined on the basis of its own facts measured against the requirements of the Act.").

### 2. *Right to Control Absent Corporate Affiliation—Fact or Law*

■ Accordingly, at this point we part company with *Long*'s determination that "the question of whether the rights retained under the leases are equivalent to the terms 'supervision' and 'control' as used in the Act is ... a question of statutory construction and interpretation, *i.e.,* a question of law and not of fact." *Long,* 1 BLR at 1–164. Rather, we agree with Elliot that neither the regulations nor the statements of the Secretary concerning the meaning of the Act imply a *per se* rule. They speak in permissive, not mandatory terms, because the Secretary in her statements and the regulations themselves has indicated that whether a lessor is an operator responsible for black lung benefits must be determined on a case-by-case basis. Absent some corporate relation that gives lessor or owner *de facto* power to control the person nominally in charge of operations,[24] we think the decision whether a par-

---

**22.** At the time of the ALJ's hearing in *Long,* there were forty-three such leases in effect. *Id.*

**23.** *See* Part V.A.3. *supra.*

**24.** The significance of such a corporate affiliation is pointed up by the legislative history and purpose we have already referred to at length. It indicates that Congress, in enacting § 3(d), plainly intended to prevent coal companies from

ticular lessor has retained a substantial right or power to control its lessee's operations is for the ALJ to resolve by inference from his findings of historical fact, not one for the Board to decide as a question of law. Indeed, the Board itself has stated that resolution of the control issue calls for a two-part inquiry requiring evaluation of the relationships of the parties to the leases, along with the lease terms themselves. *Id.* at 1–164. The Board's statement, "What the Act is concerned with here is not the technical refinements of title, but rather the realities of supervision and control," is not to the contrary. *Id.* at 1–174. The question of who determines the "realities" remains. Thus, while we agree with *Long* that the issue is the lessor's right or power to control, not the actual exercise of control, we also believe that the determination of who is an operator is fact specific, absent evidence of interlocking corporate relationships which would always give the owner or lessor an effective right of control.

3. *Substantial Evidence Supports the ALJ's Finding That Elliot Had No Effective Power to Control Its Lessees' Operations*

■ Here, there is no evidence that Elliot had any corporate power to control or influence the operation of its lessees. Elliot's leases and subleases are arms-length transactions, not completely uniform in their terms, and not contracts of adhesion as in *Long. See Long,* 1 BLR at 1–165 to 1–168. In addition, Elliot had lost four million dollars when it ceased operations and sought only to recoup some of that loss by preserving its rights to the coal under its lease agreements. There is no evidence that the leases in the instant case yielded substantial revenue, or any revenue, for Elliot. In contrast, there is evidence in the record that the terms of Elliot's subleases were dictated to it by its lessors in accord with the terms of the prime leases. Furthermore, revenues and royalties derived from Elliot's subleases were primarily passed through to Elliot's lessors. Deep mining was never continued after June 1973, on the lands Elliot owned in fee, though

strip mining was conducted on them by independent contractors such as Helena up to 1978. Thereafter, Power leased them from Elliot under agreements that gave it the right to mine them to exhaustion.

It follows that there is substantial evidence on the whole record from which the ALJ could have found that Elliot was not an owner or lessor who retained substantial power to control mining operations on lands it leased to others for its own economic benefit. There is likewise substantial evidence to show that Elliot is not an owner or lessor who simply changed corporate form, structure or method of operation in order to retain the economic value of coal mined from its lands while avoiding responsibility for black lung benefits due the miners who worked for it after the Act became effective. We also think the ALJ could properly infer that Elliot was a failed business seeking to liquidate its assets in preparation for dissolution. In doing so, he seems to have credited Elliot's President's testimony that the decision to shut down Elliot's operations was based on economic factors arising out of the losses it had incurred, and that Elliot granted its sublessees mining rights to prevent complete loss of the rights its own lessors had given it.

Perhaps most significantly, there is evidence in this record indicating that Elliot had no effective power to supervise to any substantial degree the strip mining done by the independent contractors who operated after June 1973, on lands leased from Elliot. The evidence also shows that Elliot gained little economic benefit from the mining that continued after June 30, 1973, on the lands it leased to others. Long, former President of Elliot, testified in his deposition that the revenue derived from strip mining by the independent contractors was paid to Elliot and then passed through to Elliot's lessors. He stated: "We did not as Elliot have a royalty to us. It was a pass-through to the owner of the land." App. at 508. "We were obligated to pay the owner those lands of royalties [sic]. And if somebody else was

avoiding black lung liability by changes in corporate structure and form that had no real effect on their control over the economic benefits likely to

accrue from continuing mining operations on lands owned or leased from a former operator.

there through us, they had to abide by the terms of the owners of the land whatever they were. Not by our rules, but by theirs." App. at 509.

The testimony of Minds, one of Elliot's sublessees, also supports the ALJ's finding that Elliot had no substantial power to control mining operations on the leased coal lands. He stated: "The property I was on Elliot didn't even own. They had it leased from Kittanning [sic] Coal." App. at 463. There is similar testimony from other lessees that they were not supervised or controlled in any way by Elliot and that Elliot never inspected any records despite the provision in some leases that permitted their inspection. Elliot did not have any right to tell its lessees to whom the coal they mined should be sold. It did not inspect operations. The independent contractors were responsible for insurance and compensation, determining what type of equipment to use, and inspection for safety hazards. The independent contractors who mined coal under Elliot's leases also testified that they had undertaken the responsibility for safety or environmental violations.

Finally, the sublease agreements between Elliot and Power provided that "[i]t is understood by Elliot and Power that this sublease agreement is derivative from Elliot's rights under the GR Prime Lease and Power shall do nothing to violate any term, condition, covenant, stipulation or agreement contained in the GR Prime Lease and that any such violation by Power shall give Elliot the right to terminate this sublease." App. at 191 (sublease between Elliot and Power). This same provision is contained in four other subleases with Power. The contract between Minds and Elliot also includes a consent to the sublease by the owner of the land, Kittaning Coal.

Though we agree with the Board that the key issue is whether there is evidence of a lessor's right to control, not evidence that actual control was exercised, the lessor's ability to control must be substantial. On this record, Elliot, given its financial condition and the pressures exerted by its own lessors, had only a limited ability to control and supervise its lessees and sublessees. The Board's determination that "Elliot not only retained ownership of the mining permits but also possessed, under its lease agreements, the right of inspection, the right of ejectment and confession of judgment and the right to direct the manner of coal extraction," though correct, is not controlling on Elliot's status as a responsible operator liable for black lung benefits due Kovalchick and its other former miners. App. at 24–25 (emphasis deleted). It is instead a fact that could be inferred from the record, but it is not a proper conclusion of law made necessary from the facts and record in this case. Although legal rights that evidence some power of control were enumerated in some of the leases Elliot granted after June 30, 1973, the ALJ, as factfinder, had before him substantial evidence that they were required by Elliot's own prime lessors who were the ones who had substantial power to control coal mining operations on the facts of this case. Elliot's lessors received the economic benefit of mining operations on the lands Elliot leased to others when it paid over to them the money collected from the persons, such as Helena, Power, and Minds, to whom it had granted mining rights. By doing so, Elliot hoped only to avoid breaching its lease agreements and preserve whatever value its mining leases had while it attempted to liquidate its assets. Elliot itself did not derive substantial revenue from the lease agreements and was not changing corporate form to evade liability as the responsible operator regulations were intended to prevent.

The ALJ found that:

Elliot was not a lessor with enough substantial control to make it a Responsible Operator within the meaning of the regulations. The regulations were enacted to prevent a coal mine company from circumventing responsibility for black lung benefits by merely changing the form with which it does business. Here, there were arms-length leases and Elliot exerted little or no control over the lessees. Moreover, the control and supervision in *Long v. Clearfield Bituminous Coal Corp.,* 1 BLR 1–149 (1977) is not present here. *See Moore v. Duquesne Light Co.,* ... BRB No. 80–147 BLA (June 19, 1981).

App. at 13. Because this finding is supported by substantial evidence, the Board erred when it decided that any owner or lessor who, like Elliot, retains rights similar to those present here in lease agreements executed and effective after June 30, 1973, is a responsible operator under § 3(d) of the Act and 20 C.F.R. § 725.492(a)(2). The Board exceeded its power in overturning the ALJ's decision and concluding that Elliot was an operator who was liable to former employees like Kovalchick because it continued to operate coal mines after June 30, 1973.

### C. Employment of a "Miner" After June 30, 1973

Although we have concluded that the ALJ's finding that Elliot did not possess substantial powers of supervision or control over mining operations on the coal lands it leased to others was correct, we must still consider the Director's alternative argument that Elliot is an "operator" because it employed Kanour as a miner after June 30, 1973. The regulations defining an operator state, "any employer of a miner as defined in § 725.202(a) shall, to the extent appropriate, be considered an operator for the purposes of this part...." 20 C.F.R. § 725.491(a) (1992). Section 902(d) of the Act, as well as the regulations, defines a "miner" as "any individual who works or has worked in or around a coal mine or coal preparation facility in the extraction or preparation of coal." [25] 30 U.S.C.A. § 902(d); 20 C.F.R. §§ 725.-101(a)(26), 725.202(a).

This Court has fashioned a two-prong test for determining whether an individual is a miner. See Hanna v. Director, OWCP, 860 F.2d 88, 91 (3d Cir.1988). "The definition of miner contains two elements—a 'situs' test requiring work in [or around] a coal mine [or a coal preparation facility], and the second, a 'function' component requiring performance of coal extraction or preparation work. Both of these requirements must be met." Id. (quoting Wisor v. Director, OWCP, 748 F.2d 176, 178 (3d Cir.1984) (citations omitted, brackets in original)). To sat-

isfy the situs test, a person must have worked in or around a "coal mine" or custom coal preparation facility and have been subject to coal dust exposure as a result. The term "coal mine" is defined as:

> an area of land and all structures, facilities, machinery, tools, equipment, shafts, slopes, tunnels, excavations, and other property, real or personal, placed upon, under or above the surface of such land by any person, used in, or to be used in, or resulting from, the work of extracting, in such area bituminous coal, lignite, or anthracite from its natural deposits in the earth by any means or method....

30 U.S.C.A. § 802(h)(2).

The function part of the test requires that the claimant's job be " 'integral to the extraction or preparation of coal, not ancillary to the delivery and commercial use of processed coal.' " Stroh v. Director, OWCP, 810 F.2d 61, 63 (3d Cir.1987) (holding that self-employed hauler of coal was miner because he transported coal from mine site to processing plant that further processed coal before retail sale) (citation omitted); see also Hanna, 860 F.2d at 93 (holding employee of mining company that also happened to be coal consumer who loaded coal from tipple onto barges was miner because his work was necessary in preparing coal for delivery). Even work which does not meet a strict "but for" test, i.e. but for the work no coal could be extracted or prepared, may be covered if it is "part of the extraction and preparation process as it is now practiced...." Amax Coal Co. v. Fagg, 865 F.2d 916, 919 (7th Cir.1989) (holding that "work in the extraction or preparation of coal" includes all work, including plaintiff's work as reclamation bulldozer operator, which is part of the modern commonly-applied process of extracting and preparing coal).

In the instant case, the ALJ specifically found that:

> Mr. Kanour does not meet the "situs" [prong of the situs-function] test. Mr.

---

**25.** The term "miner" also includes "an individual who works or has worked in coal mine construction or transportation in or around a coal mine, to the extent that such individual was exposed to coal dust as a result of such employment." 30 U.S.C.A. § 902(d). This aspect of the definition is not involved in the instant case.

Kanour's activities involved no oversight or control; he was an observer, was in the mines on an occasional basis, and reported to Elliot regarding the lessees' operations. In *Zavora v. United States Steel Corp.*, 2 BLR 1–1202, 1208–10 (1980), the Benefits Review Board held that a Department of Interior inspector was not a "miner" while employed at the Department because he was only occasionally in the mines. Here, Mr. Kanour was not in the leased mines enough to be considered a "miner." Thus, Elliot did not employ a miner or miners after June 30, 1973.

App. at 13.[26] We agree with the ALJ that Kanour was not a "miner." In the instant case, it is not disputed that Elliot employed Kanour after June 30, 1973. The nature and characterization of his employment is what is in dispute. He worked out of the main office that Helena and Power also used and was required to travel by company truck among five strip mines within a fifteen mile radius. He assisted Minds in performing noise samples and, according to Long, he looked after Elliot's equipment before it was sold and answered employee questions about whether there was going to be any more work. According to Kanour himself, he took care of the permits and leases and made sure the contractors were staying within DER regulations and that the reclamation procedures were timely carried out. He also answered some of the employees' questions concerning what they should do regarding certain regulations. According to the independent contractors, no Elliot employees, including Kanour, assisted or directed their coal production. Avery, President of Helena and later Power, also stated in her deposition that Elliot did not send any inspectors to check the mining operations. Elliot also did not inform her of any type of specific preparation process that they should use for the coal. Furthermore, Elliot never told them how to mine the coal, never told them how to go about selling it, never sent anyone to help

supervise the mining, and never had any financial interest in her company. Kanour was present at the mines on only limited occasions and did not perform the functions of a miner. *Cf. Falcon Coal Co., Inc. v. Clemons*, 873 F.2d 916, 918 (6th Cir.1989) (night watchman at strip mine was not "miner").

Substantial evidence supports the ALJ's finding that Kanour was not a "miner" within the meaning of the Act after June 30, 1973.[27] Thus, Elliot cannot be considered an operator on this alternative basis.

## VI.

In summary, the statute and regulations require Elliot to have supervised, controlled or operated a coal mine after June 30, 1973, in order to be a responsible operator liable for black lung benefits to its former employees. The determination is factual in nature and under the facts of this case, there was substantial evidence to support the ALJ's determination that Elliot was not a responsible operator. Thus, the Board exceeded its scope of review, and we will grant Elliot's petition for review, vacate the Board's order holding Elliot is an operator responsible for payment of Kovalchick's benefits and remand the case to the Board for further proceedings consistent with this opinion.

---

26. The Board did not address this issue because it found that Elliot had sufficient supervision and control over the sublessees/independent contractors through its lease agreements to be a responsible operator.

27. We recognize that the ALJ determined that Kanour was not a miner because he failed the situs prong of the test; however, we also believe that the evidence shows that the function prong was not met as well.