Thomas A. DEMKO and Penn Arms, Inc., Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 98–661T.

United States Court of Federal Claims.

June 18, 1999.

**84**

Richard E. Gardiner, Fairfax, VA, for plaintiffs.

David R. House, Washington, D.C., with whom was Assistant Attorney General Loretta C. Argrett, for defendant.

## OPINION

MILLER, Judge.

This case, before the court after argument on the parties' cross-motions for summary judgment, presents the issues (1) whether the Striker–12 shotgun was properly classified as a destructive device and thus subject to a $200.00 transfer tax pursuant to 26 U.S.C. § 5811 (1994), and (2) if so, whether the delegation of legislative authority to so classify is unconstitutionally vague.

### FACTS

The following facts are undisputed, unless otherwise noted. The Striker–12 is a 12–gauge shotgun with a 12–round spring motor driven revolving magazine. 26 U.S.C. § 5845(f)(2) of 26 U.S.C. describes a destructive device as

> any type of weapon by whatever name known which will, or which may be readily converted to, expel a projectile by the action of an explosive or other propellant, the barrel or barrels of which have a bore of more than one-half inch in diameter, except a shotgun or shotgun shell which the Secretary finds is generally recognized as

particularly suitable for sporting purposes . . . .

Statutorily defined firearms, particularly those classified as destructive devices, must be registered and are subject to taxes at the time of transfer. *See* 26 U.S.C. §§ 5812, 5822, 5841, 5845(a)(8), (f)(2) (1994). The Secretary of the Treasury, who has enforcement authority pursuant to 26 U.S.C. § 7801(a), delegated authority to the Bureau of Alcohol, Tobacco and Firearms (the "ATF") to make such classifications by means of Treasury Department Order No. 221, 1972–1 C.B. 777. The ATF issued Ruling 94–2 effective March 1, 1994, classifying the Striker–12 as a "destructive device" within the meaning of 26 U.S.C. § 5845(f).[1] The ATF Ruling recited the following description:

> The Striker–12 and Streetsweeper shotguns are virtually identical 12–gauge shotguns with a spring-driven revolving magazine. The magazine has a 12–round capacity. The shotgun has a fixed stock or folding shoulder stock and may be fired with the folding stock collapsed. The shotgun with an 18–inch barrel is 37 inches in length with the stock extended, and 26.5 inches in length with the stock folded. The shotgun is 5.7 inches in width and weighs 9.24 pounds unloaded. The Striker/Streetsweeper has two pistol grips, one in the center of the firearm below the buttstock, and one on the forearm. The Striker/Streetsweeper was designed and developed in South Africa as a military, security, and anti-terrorist weapon. Various types of 12–gauge cartridge can be fired from the shotgun, and a rapid indexing procedure allows various types of ammunition to be loaded into the cylinder and selected for firing. All 12 rounds can be fired from the shotgun in 3 seconds or less.

After considering the composition, utility, and purpose of the weapon, the ATF concluded:

> The Striker–12/Streetsweeper is a shotgun with a bore of more than one-half

---

1. The ATF is an agency of the Department of Treasury and is authorized to collect taxes levied by 26 U.S.C. § 5811.

inch in diameter which is not particularly suitable for sporting purposes. The weight, size, bulk, designed magazine capacity, configuration, and other factors indicate that the Striker–12/Streetsweeper is a military-type shotgun, as opposed to a shotgun particularly suitable for sporting purposes. Accordingly, the Striker–12/Streetsweeper is a destructive device as that term is used in 26 U.S.C. § 5845(f)(2). Pursuant to section 7805(b), this ruling is applied prospectively effective March 1, 1994, with respect to the making, transfer, and special (occupational) taxes imposed by the [National Firearms Act (the "NFA"), 26 U.S.C. Chapter 53]. All other provisions of the NFA apply retroactively effective March 1, 1994.

Pursuant to the Violent Crime Control and Law Enforcement Act of 1994, Pub.L. No. 103–322, 108 Stat. 1796, 1996–2010 (1994), which amended the Gun Control Act of 1968, 18 U.S.C. §§ 921–928 (1994 & Supp. II 1996), the manufacture, transfer, and possession of certain weapons was restricted. The Striker–12/Streetsweeper was included in the list of banned semiautomatic assault weapons because of its revolving cylinder. *See* 18 U.S.C. §§ 921(a)(30)(A)(ix), 922(v) (1994). Pursuant to the grandfather clause, however, those weapons otherwise lawfully possessed prior to the date of enactment were excluded from this ban. *See* 18 U.S.C. § 922(v)(2). The weapon transfer at issue here was subject to the grandfather provision. *See generally, Navegar, Inc. v. United States,* 103 F.3d 994 (D.C.Cir.1997) (discussing 1994 Crime Control Act amendments with regard to, *inter alia,* Striker–12).

In April 1997 plaintiff Penn Arms, Inc., applied to the ATF for permission to transfer a Striker–12 to plaintiff Sheriff Thomas A. Demko in his individual capacity.[2] The $200.00 transfer tax imposed by 26 U.S.C. § 5811 was paid at the time of transfer. The ATF approved the transfer on or about January 4, 1995. Plaintiffs filed a request for a refund of the $200.00 transfer tax by letter dated February 26, 1997. The ATF has not rendered a decision on this request.

Plaintiffs challenge the ATF's findings and conclusions on a number of grounds. Plaintiffs dispute whether all 12 rounds may actually be fired within the 3–second interval stated in the ATF's ruling. In support of this position, plaintiffs submit the Affidavit of J.F. Kornberger, who was in charge of the original development of the Striker–12 in South Africa, and is the Director of Engineering for Penn Arms and held the same position with the predecessor manufacturer of the Striker–12 in the United States. Mr. Kornberger avers: "While the mechanical design of the Striker 12 allows all 12 rounds to be fired in three seconds, I know of no person who can actually do so. After firing thousands of rounds with the Striker 12 (probably more than any other person), I can only fire all 12 rounds in six or seven seconds." Affidavit of J.F. Kornberger, Oct. 19, 1995, ¶ 4. Plaintiffs also challenge the assertion that the weapon was developed in South Africa as a military, security, and anti-terrorist weapon. Indeed, plaintiffs put forth:

The basic design of the Striker 12 was originally conceived by a Rhodesian cattle farmer named Hilton Walker who wished to have a multi-round shotgun for killing small animals, such as snakes and scorpions, which were threatening his cattle and for home defense. He designed the Striker 12 for sale to farmers. It was not designed for the military or for anti-terrorist use by law enforcement. In fact, as manufactured in South Africa, not a single Striker 12 was sold to the military or law enforcement.

Kornberger Affidavit ¶ 2. Plaintiffs also dispute that the Striker–12 is not generally recognized as particularly suitable for sporting purposes and that the Striker–12 is a military-type shotgun. According to plaintiffs, ATF Ruling 94–2 is the only authority that has concluded "that the Striker 12 'is not particularly suitable for sporting purposes.' ATF Ruling 94–2 does not even discuss, let alone conclude, that the Striker 12 is not 'generally recognized as' particularly suitable for sporting purposes." Plf's Statement of Genuine Issues No. 3, filed Mar. 24, 1993.[3]

---

**2.** Penn Arms and plaintiff will be referred to collectively as "plaintiffs."

**3.** Because plaintiffs did not challenge the determination that the Striker–12 is generally recog-

Nevertheless, plaintiffs agreed during argument that disputes regarding the factual basis of the ATF Ruling were not material to the resolution of this matter. *See* Transcript of Proceedings, *Demko v. United States*, No. 98–661T, at 3 (Fed.Cl. June 18, 1999) (hereinafter "Tr.").

Plaintiffs seek review of this classification and the authority of the ATF to make such determinations with regard to shotguns, as well as a refund of the $200.00 tax paid upon transfer of this weapon pursuant to 26 U.S.C. § 7422 (1994 & Supp. II 1996).

## DISCUSSION

### 1. *Classification of the Striker–12*

Plaintiffs maintain that the primary issue before the court is whether the ATF had the authority to classify the Striker–12 as a destructive device pursuant to 26 U.S.C. § 5845(f). The resolution of this issue requires an interpretation of the last clause of 26 U.S.C. § 5845(f)(2), which excepts from the definition of a destructive device "a shotgun or shotgun shell which the Secretary finds is generally recognized as particularly suitable for sporting purposes." According to plaintiffs, the ATF lacked the authority to classify the Striker–12 as a destructive device because the clause "which the Secretary finds is generally recognized as particularly suitable for sporting purposes" applies only to "shotgun shell" and does not modify "shotgun." Plaintiffs rely on the doctrine of the last antecedent as compelling their reading because the drafters of this provision did not include a comma before the disjunctive. As a result, the clause would only apply to the term immediately preceding it, "shotgun shell." Plaintiffs direct the court's attention to the legislative history surrounding the evolution of the definition of destructive device, which, according to plaintiffs, should be persuasive that all shotguns were excluded from the definition of destructive device.

Defendant rests on a natural reading of the statute—giving the words their ordinary meanings—to reveal that the clause modifies

both shotgun and shotgun shell. Defendant points out that a comma sets off the entire exclusionary clause from the definition of destructive device, and suggests that the clause should be read as a whole. Defendant dismisses plaintiffs' attempts "to cast doubt as to the meaning of this phrase by injecting ambiguity where none exists. The normal reader would not doubt that the 'sporting purposes' [test] modifies both 'shotgun shell' and 'shotgun,'" Def's Br. filed Jan. 22, 1999, at 10, terming plaintiffs' suggested reading "nonsensical." *Id.* at 18. Defendant touts the same legislative history surrounding the actual bill passed in furtherance of its position, and posits that "legislative history not only supports the position that the natural reading of the statute provides for application of the sporting purposes test to both 'shotgun' and 'shotgun shell[,]' but in fact requires that reading of the statute." *Id.* at 14.

 Statutory interpretation begins with an examination of the text of the statute. *See Fanning, Phillips & Molnar v. West*, 160 F.3d 717, 721 (Fed.Cir.1998); *Hoechst–Roussel Pharm. v. Lehman*, 109 F.3d 756, 758 (Fed.Cir.1997). "In so doing, we must interpret statutory words as taking their ordinary, common meaning unless otherwise defined by Congress." *Hoechst–Roussel*, 109 F.3d at 758; *see NSK Ltd. v. United States*, 115 F.3d 965, 974 (Fed.Cir. 1997) ("[W]here Congress uses terms that have accumulated settled meaning under either equity or common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms.") (quotation omitted); *Best Power Tech. Sales Corp. v. Austin*, 984 F.2d 1172, 1177 (Fed.Cir.1993) ("It is a basic principle of statutory interpretation ... that undefined terms in a statute are deemed to have their ordinarily understood meaning."); *see also Wilshire Westwood Assocs. v. Atlantic Richfield Corp.*, 881 F.2d 801, 803–04 (9th Cir.1989) ("'A fundamental canon of statutory construction is

nized as being particularly suitable for sporting purposes in their claim for a refund, plaintiffs may not now raise this objection. *See Ottawa Silica Co. v. United States*, 699 F.2d 1124, 1138

(Fed.Cir.1983) (discussing doctrine of variance); *see also* 26 U.S.C. § 7422(a) (1994); 27 C.F.R. § 70.123(b)(1) (1996); 26 C.F.R. § 301.6402–2(b)(1) (1997).

that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning.' ") (quoting *Perrin v. United States,* 444 U.S. 37, 42, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979)).

■ When Congress' intent is clear from the language of the statute, the matter is at an end because the court is required to "give effect to the unambiguously expressed intent of Congress." *Chevron, U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *see Nike, Inc. v. Wal–Mart Stores, Inc.,* 138 F.3d 1437, 1440 (Fed.Cir.1998) ("Although a statute clear on its face does not warrant resort to history, inquiry is proper to determine whether ambiguity has invaded an apparently clear text."), *petition for cert. filed,* June 4, 1999, No. 98–1942; *see also Perez v. United States,* 156 F.3d 1366, 1370–72 (Fed.Cir.1998) (noting plain language of statute is controlling, but resorting to legislative history to resolve issue before court); *Elliot Coal Mining Co. v. Director, Office of Workers' Compensation Programs,* 17 F.3d 616, 631–32 (3d Cir.1994) (reviewing legislative history which conformed with court's reading of statutory language); *District 6, UMWA v. Dep't of the Interior Board of Mine Operations Appeals,* 562 F.2d 1260, 1264–65 (D.C.Cir.1977) (finding two interpretations of statute permissible and referring to legislative history to determine congressional intent).

■ However, where a literal interpretation contravenes the purpose of the statutory scheme, leads to an absurd result, or is ambiguous, the court will look beyond the express language of the statute. *See Brooks v. Donovan,* 699 F.2d 1010, 1011 (9th Cir. 1983); *see also Resolution Trust Corp. v. Nernberg,* 3 F.3d 62, 64 (3d Cir.1993). "[I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron,* 467 U.S. at 843, 844–45, 104 S.Ct. 2778 (noting that considerable deference is due construction of a statutory scheme agency is entrusted to administer unless contrary to congressional intent); *see Elliot Coal,* 17 F.3d at 629 (stating deference

is not required when agency's construction of statutory provisions is in conflict with plain meaning). Statutes should not be construed in a manner that obviates the need for any provision. *See Wilshire Westwood,* 881 F.2d at 804; *Loe v. Secretary of DHHS,* 22 Cl.Ct. 430, 432 (1991) ("[T]he rule of the last antecedent does not override the even more fundamental princip[le] of statutory construction that the statute must be read in its entirety. The court cannot construe a phrase in question without reference to the statute as a whole.") (citation omitted). Taken into consideration is " 'not only the bare meaning of the word but also its placement and purpose in the statutory scheme.' " *Fanning, Phillips,* 160 F.3d at 721 (quoting *Bailey v. United States,* 516 U.S. 137, 145, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995)).

### 2. *The doctrine of the last antecedent*

■ "The doctrine of the last antecedent states that qualifying words, phrases and clauses must be applied to the words or phrases immediately preceding them and are not to be construed as extending to and including others more remote." *Wilshire Westwood,* 881 F.2d at 804; *see Vogel Fertilizer Co. v. United States,* 225 Ct.Cl. 15, 25–26, 634 F.2d 497, 502–03 (1980), *aff'd,* 455 U.S. 16, 102 S.Ct. 821, 70 L.Ed.2d 792 (1982); *Elliot Coal,* 17 F.3d at 629 (quoting *Azure v. Morton,* 514 F.2d 897, 900 (9th Cir.1975)). Standard rules of grammar remain applicable. *See Anhydrides & Chems., Inc. v. United States,* 130 F.3d 1481, 1483 (Fed.Cir.1997) (stating "rules of grammar apply in statutory construction"); *Vogel Fertilizer,* 225 Ct.Cl. at 25–26, 634 F.2d at 502–03 (basing decision, in part, on common English usage).

> Under the normal rules of English punctuation for words in a series, it is the absence of a comma or other punctuation before the coordinate conjunction "or" that would indicate it and its modifier, the limiting adjective clause, are to be treated separately rather than as part of the whole series. Conversely, the presence of a comma before the last clause in the statute suggests that the limiting clause applies to the entire series.

*Elliot Coal,* 17 F.3d at 630 (citations omitted) (finding use of comma indicates application of modifying phrase to all preceding phrases); *see Resolution Trust,* 3 F.3d at 65 ("The use of a comma to set off a modifying phrase from other clauses may indicate that the qualifying language ... applie[s] to all of the previous phrases.... Consequently, the lack of a comma before the last clause ... suggests that the limiting phrase applies only to the third clause.") (citation omitted); *cf. National Sur. Corp. v. Midland Bank,* 551 F.2d 21, 34 (3d Cir.1977) (holding limiting language applied only to word immediately preceding it in absence of comma). The syntax of the language at issue is also significant, and should be read in a manner that gives meaning to all parts. *See Elliot Coal,* 17 F.3d at 630–31. Nonetheless, the rules of grammar and syntax are not necessarily dispositive. *See id.* at 631; *Resolution Trust,* 3 F.3d at 65 ("We do not believe, however, that we should allow syntax to completely control the resolution of this issue and, thus, must find something a bit more substantial to support construction."). The court may also look to the intent and purpose of the statute in ascertaining its meaning. *See Elliot Coal,* 17 F.3d at 630–32; *Resolution Trust,* 3 F.3d at 65 (looking to purpose of statute and

" 'mischief and defect' ... statute was intended to cure") (citation omitted).[4]

■ The key clause, 26 U.S.C. § 5845(f)(2), in context, reads:

> The term "destructive device" means ... any type of weapon by whatever name known which will, or which may be readily converted to, expel a projectile by the action of an explosive or other propellant, the barrel or barrels of which have a bore of more than one-half inch in diameter, *except a shotgun or shotgun shell which the Secretary finds is generally recognized as particularly suitable for sporting purposes....*

(Emphasis added.) Two exceptions are listed in the modifying clause at issue here—shotgun and shotgun shell. The entire clause is set off from the rest of the provision by a comma. Within the clause, however, the terms shotgun and shotgun shell are connected by the disjunctive "or."

"Generally the term 'or' functions grammatically as a coordinating conjunction and joins two separate parts of a sentence." *Ruben v. Secretary of DHHS,* 22 Cl.Ct. 264, 266 (1991) (noting that "or" is generally ascribed disjunctive intent unless contrary to legislative intent). As a disjunctive, the word "or" connects two parts of a sentence, "but discon-

---

4. If, after applying the rules of statutory construction, the court is left with an ambiguous statute, the rule of lenity may be invoked. The rule of lenity resolves ambiguities in favor of the private citizen. Thus, if a statute is susceptible to more than one interpretation, the less harsh penalty will apply. Because, in this instance, criminal penalties may attach to the failure to pay taxes on firearms, invocation of the rule of lenity in plaintiffs' favor would be proper in the case of an ambiguous statute. *See United States v. Thompson/Center Arms Co.,* 504 U.S. 505, 517–18, 112 S.Ct. 2102, 119 L.Ed.2d 308 (1992) (applying rule of lenity in civil context upon finding that statute was ambiguous because NFA has criminal applications); *Crandon v. United States,* 494 U.S. 152, 168, 110 S.Ct. 997, 108 L.Ed.2d 132 (1990); *cf. Zwak v. United States,* 848 F.2d 1179 (11th Cir.1988) (finding taxes at issue civil in nature). "To the extent that the language or history of [a statute] is uncertain, this 'time-honored interpretive guideline' serves to ensure both that there is fair warning of the boundaries of criminal conduct and that legislatures, not courts, define criminal liability." *Crandon,* 494 U.S. at 158, 110 S.Ct. 997 (quoting *Liparota v. United States,* 471 U.S. 419, 427, 105 S.Ct. 2084,

85 L.Ed.2d 434 (1985)). A mere grammatical possibility, however, is insufficient to invoke the rule of lenity, particularly as a degree of ambiguity is present in most statutes. *See Caron v. United States,* 524 U.S. 308, ——, 118 S.Ct. 2007, 2012, 141 L.Ed.2d 303 (1998); *Muscarello v. United States,* 524 U.S. 125, ——, 118 S.Ct. 1911, 1919, 141 L.Ed.2d 111 (1998) ("The rule of lenity applies only if, after seizing everything from which aid can be derived, ... we can make no more than a guess as to what Congress intended.") (quotations omitted); *see Thiess v. Witt,* 100 F.3d 915, 918 (Fed.Cir.1996) (noting "a term of a statute does not become ambiguous because it is possible to articulate a different construction"). Instead, the statute must contain a "grievous ambiguity or uncertainty." *Staples v. United States,* 511 U.S. 600, 619 n. 17, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994) (quotations omitted). Here, the plain language of the statute is not ambiguous. Thus, the rule of lenity is inapplicable. Plaintiffs' interpretation of the statute contravenes its plain meaning and "takes us over the line between lenity and credulity." *Thompson/Center Arms,* 504 U.S. at 513 n. 6, 112 S.Ct. 2102.

nect[s] their meaning, the meaning in the second member excluding that in the first." *Id.* (quoting G. Curme, *A Grammar of the English Language, Syntax* 166 (1986)); *see Quindlen v. Prudential Ins. Co.*, 482 F.2d 876, 878 (5th Cir.1973) (noting disjunctive results in alternatives, which must be treated separately). Nonetheless, courts have not adhered strictly to such rules of statutory construction. *See Ruben,* 22 Cl.Ct. at 266. For instance, "[i]t is settled that 'or' may be read to mean 'and' when the context so indicates." *Willis v. United States,* 719 F.2d 608, 612 (2d Cir.1983); *see Ruben,* 22 Cl.Ct. at 266 (quoting same); *see also De Sylva v. Ballentine,* 351 U.S. 570, 573, 76 S.Ct. 974, 100 L.Ed. 1415 (1956) ("We start with the proposition that the word 'or' is often used as a careless substitute for the word 'and'; that is, it is often used in phrases where 'and' would express the thought with greater clarity."); *Union Ins. Co. v. United States,* 6 Wall. 759, 73 U.S. 759, 764, 18 L.Ed. 879 (1867) ("But when we look beyond the mere words to the obvious intent we cannot help seeing the word 'or' must be taken conjunctively.... This construction impairs no rights of the parties ... and carries into effect the true intention of Congress....").

Plaintiffs interpret the clause to apply the limiting language—"which the Secretary finds is generally recognized as particularly suitable for sporting purposes"—only to the term "shotgun shell," which immediately precedes it. Relying on the doctrine of the last antecedent, plaintiffs maintain that the absence of a comma following the word "shotgun" limits the application of the subsequent qualifying language to shotgun shell. In other words, plaintiffs read the statute to exempt all shotguns, but only those shotgun shells that the Secretary or his delegate finds are generally recognized as particularly suitable for sporting purposes.

Defendant responds that the addition of a comma after shotgun would require exactly the opposite interpretation that plaintiffs proffer, to wit, "that Congress intended to treat the terms separately, with the modifying language applying only to the term 'shotgun shell.'" Def's Br. filed Jan. 22, 1999, at

18. According to defendant, if plaintiffs' suggestion with regard to the addition of a comma after shotgun were employed, the language would read: "except a shotgun[,] or shotgun shell which the Secretary o[r] his delegate finds is generally recognized as particularly suitable for sporting purposes...." Def's Br. filed Jan. 22, 1999, at 18. Plaintiffs respond that, if Congress intended the sporting purposes test to apply to both shotgun and shotgun shells, the sentence would read: "except a shotgun[,] or shotgun shell[,] which the Secretary or his delegate finds is generally recognized as particularly suitable for sporting purposes...." Plfs' Br. filed Mar. 24, 1999, at 4. Plaintiffs' reading would place shotgun shell in apposition to the word shotgun. A shotgun shell and a shotgun are not the same, nor does "shotgun shell" provide additional information regarding the word "shotgun." Thus, plaintiffs' proffered construction defies all rules of syntax. Reasoning that a comma normally is employed in a series of three or more words or phrases, defendant concludes that a comma has no bearing on this matter. Defendant further contends that, "[d]espite plaintiffs' tortured attempts to inject ambiguity into the statute, ... the legislative history of § 5854(f)(2) in fact confirms that the plain meaning applies the sporting purposes test to 'shotgun' as well as 'shotgun shell.'" *Id.* at 19.

A plain reading of the statutory language reveals that the entire dependent clause is a limitation on those weapons that fall within the definition of a destructive device and is itself the last antecedent. The qualifying language is separated from the rest of the provision with a comma and, as a whole, applies to that which precedes it. An ordinary reading of this limiting language suggests that both shotguns and shotgun shells found to be generally recognized as suitable for sporting purposes are excluded from classification as destructive devices. Although the language used employs the disjunctive "or," the disjunctive is located within the limiting language and susceptible to the interpretation that "or" in this instance was not utilized as an exclusive disjunct, but rather as an inclusive disjunct, to wit, "and."[5]

---

**5.** "Or" is "(1) used as a function word to indicate

an alternative ..., the equivalent or substitutive

Moreover, as only two items appear in this series, a *comma* normally would not be used to separate shotgun and shotgun shell.

The doctrine of the last antecedent does not assist plaintiffs. This doctrine includes the notion that qualifying language applies to the words or phrases immediately preceding inasmuch as it does not impair the meaning of the sentence. As such, it is consistent to apply the qualifying language within the dependent clause to both shotgun and shotgun shell. The court, in this instance, is not confronted by a series of three words or phrases all separated by commas. *See Elliot Coal*, 17 F.3d at 629–30 (holding last antecedent inapplicable because "owner, lessee, or other person" were separated by commas requiring application of subsequent limiting language to entire series, and finding this interpretation consistent with plain language and grammatical constructs). The plain meaning of the statute, read in its entirety, also supports interpretation that the entire clause is the last antecedent and that the qualifying language within the limiting clause is applicable to both a shotgun and a shotgun shell. *Cf. National Surety*, 551 F.2d at 34 (finding that absence of comma limited application of qualifying language to word preceding it, rather than more remote phrase, which was consistent with plain meaning of statute). Moreover, defendant correctly points out that a singular verb in this context is appropriate because the plain meaning of the statute indicates that the sporting purposes test will at times apply to a shotgun, while at others a shotgun shell. *Cf. Wilshire Westwood*, 881 F.2d at 804–05 (concluding that plaintiffs' proposed application to series of two was contrary to doctrine of last antecedent, which would require plural verb when "actual grammar sets forth a singular verb").

Although the parties agree that resort to legislative history is unnecessary because the statutory language is clear, the legislative history bolsters defendant's reading of the statute. Defendant presents both the Senate and House Committee Reports concerning

amendments by the Gun Control Act of 1968, Pub.L. No. 90–618, 82 Stat. 1213 (1968), codified at 18 U.S.C. §§ 921–928, which, *inter alia*, amended 26 U.S.C. § 5845(f)(2). The House Conference Report notes: "The Senate amendment is essentially the same as the House bill, *except* that ... excluded from the definition are *shotguns and shotgun shells* found by the Secretary to be suitable for sporting purposes...." Gun Control Act of 1968, Conference Report, H.R. REP. No. 90–1956 (1968), *reprinted in* 1968 U.S.C.C.A.N. 4426, 4427 (emphasis added) (hereinafter "Conference Report"). The House Committee on the Judiciary Report recited:

> The urgent necessity for adding restrictions on transactions in long guns equivalent to those Congress has already applied to handguns is sadly evident from recent history and mounting statistics. Of the 6,500 firearms murders in the United States each year, 30 percent, or over 2,000, are committed with rifles or shotguns. Ninety-five percent of all law enforcement officers killed in the line of duty are victims of firearms—and one out of every four of these is killed by a rifle or shotgun.... President Kennedy, Martin Luther King, Jr., Medgar Evers, and the 16 dead and 31 wounded victims of a deranged man firing from the tower of the University of Texas were all shot by rifles or shotguns. H.R. 17735, as amended, is designed effectively to control the indiscriminate flow of such weapons across State borders and to assist and encourage States and local communities to adopt and enforce stricter gun control laws.

H.R. REP. No. 90–1577 (1968), *reprinted in* 1968 U.S.C.C.A.N. 4410, 4413 (hereinafter "House Committee Report"). The House Committee Report indicated that the amendments added restrictions covering transactions in ammunition and transactions in rifles and shotguns approximating those restrictions applying to handguns, as well as "tighter restrictions of shipments and sales of destructive devices." *Id.* Although the Senate Committee on the Judiciary Report dealing with the amendments to the Gun Control Act

---

character of two words or phrases ...; (2) either; ... (4) used in logic as a sentential connective that forms a complex sentence which is true *when at least one* of its constituent sentences is true." *Merriam–Webster's Collegiate Dictionary* 817 (10th ed.1998) (emphasis added).

of 1968, referred to the amendments to the term destructive device as "a technical revision of existing law," the Report went further to note that the term destructive device was being enlarged to encompass large caliber weapons except, *inter alia,* "*any shotgun shell or shotgun* generally recognized as particularly suitable for shooting sport purposes." S. REP. No. 90–1501, at 30, 47 (1968) (emphasis added).[6]

Plaintiffs contend that the foregoing references to "shotgun shell or shotgun," as well as "shotguns and shotgun shells," were erroneous variances. Urging the court to disregard these reports and focus on the language of the statute itself, plaintiffs also point out that the Conference Report excluded any shotgun other than a short-barreled shotgun. *See* Conference Report at 4427. Plaintiffs also rely on the statement that "[t]he Senate amendment is essentially the same as the House bill." *Id.* Plaintiffs, however, fail to place these statements in context. The Conference Report recited the definitions included in the House amendments and noted the similarities between the House and Senate bills. Significantly, the Conference Report then recited the differences between the two bills. Specifically, it noted that the Senate bill "excluded from the definition [of destructive device] ... shotguns and shotgun shells found by the Secretary to be suitable for sporting purposes." *Id.* The Conference Report then "adopt[ed] the Senate amendment" with regard to the definition of destructive device. *Id.* Thus, the Conference Report does not support plaintiffs' contentions.

Contesting the validity of committee reports, plaintiffs also seek support for their interpretation of the statute in comments from individual legislators. Plaintiffs emphasize that Congress does not vote on committee reports, but, rather, on the text of the statute itself, and that the comments from individual legislators more accurately reflect the intent of Congress. *See Schwegmann Bros. v. Calvert Distillers Corp.,* 341 U.S. 384, 394–95, 71 S.Ct. 745, 95 L.Ed. 1035 (1951) ("It is the sponsors that we look to when the meaning of the statutory words is in doubt."). Although plaintiffs are correct that the committee reports may not be altered and thus may not accurately reflect the intent of Congress in every instance, individual references that the bill revisions, in its various forms, merely were technical, non-controversial, or meant to exclude every weapon beyond a shotgun, rifle, pistol or revolver do not undermine the court's interpretation. *See* 114 Cong. Rec. 26,900, 26,903 (1968); *see also In re Kelly,* 841 F.2d 908, 912 n. 3 (9th Cir.1988) ("To the extent that legislative history may be considered, it is the official committee reports that provide the authoritative expression of legislative intent, ... stray comments by individual legislators, not otherwise supported ..., cannot be attributed to the full body that voted on the bill. The opposite inference is more likely."); *Abourezk v. Reagan,* 785 F.2d 1043, 1054–55 n. 11 (D.C.Cir.1986) (noting statutory text is more reliable than committee reports), *aff'd,* 484 U.S. 1, 108 S.Ct. 252, 98 L.Ed.2d 1 (1987).[7] Plaintiffs assume, without

---

**6.** Plaintiffs had no contest with materials that defendant submitted with its final brief. An authoritative handbook on weapons described the Striker–12 "as a potential military, security and anti-terrorist weapon." *Jane's Infantry Weapons* 244 (13th ed.1987). *See generally Persyn v. United States,* 34 Fed.Cl. 187, 190 n. 3 (1995) (referencing one of Jane's yearbooks), *aff'd,* 106 F.3d 424, 1996 WL 740996 (1996) (Table), *cert. denied,* 520 U.S. 1213, 117 S.Ct. 1697, 137 L.Ed.2d 824 (1997). Similarly, the manufacturer's advertisement refers to the Striker–12 as "the ultimate weapon in law enforcement of the future. *Its awesome fire power, compact styling, lack of recoil, and complete reliability makes the use of any other shotgun by law enforcement personnel a serious compromise in personal safety."* The description continues to portray the Striker–12 as providing "a powerful psychological edge when

confronting volatile situations .... Multiple assailants can now be addressed with confidence ..... *This is a proven firearm currently in use in police and combat situations throughout the world."*

**7.** The text of the floor debates reveals that a technical revision to the definition of destructive device was contemplated. A close reading of the statements both preceding and following the indication that the amendment was a technical revision suggests that the legislators contemplated the exclusion of certain shotguns and/or shotgun shells.

Mr. Pastore. Directing attention to line 6, it says here: "except a shotgun or shotgun shell which the Secretary or his delegate finds is generally recognized as particularly suitable for sporting purposes;".

record support, that bringing all shotguns within the control of the NFA, as destructive weapons, would have been contrary to the intent of the proponents of the amendments.[8] The statute plainly indicates that only those shotguns that fall within the definition of a destructive device and that are not considered generally recognized for sporting purposes are so classified.

Since 1968 the language of 18 U.S.C. § 921(a)(4) has defined destructive device as

(B) any type of weapon (other than a shotgun or a shotgun shell which the Secretary finds is generally recognized as particularly suitable for sporting purposes) by whatever name known which will, or may be readily converted to, expel a projectile by the action of an explosive or other propellant, and which has any barrel with a bore of more than one-half inch in diameter.[9]

This language directly parallels that incorporated into the definition of destructive device in 26 U.S.C. § 5845(f)(2). Although the statute provides for the classification of some shotguns or shotgun shells as destructive devices, shotguns or shotgun shells are not *per se* classified as such and subject to being banned. Moreover, the interchangeable references—"shotgun or shotgun shell," "shotgun shell or shotgun," "shotguns and shotgun shells"—in the legislative reports and statutory definitions support the conclusion that the entire clause is the last antecedent and the "or" separating shotgun and shotgun shell serves as an inclusive disjunct applying to both, as well as each individually depending upon the circumstances of the particular case before the ATF. Such a "reading of the statutory language is consistent with Congress's goal in enacting the legislation containing the section, which was to achieve greater control and regulation of weapons that can be used in violent crimes." *United States v. Tribunella*, 749 F.2d 104, 109, 110 (2d Cir.1984) (noting that behind Gun Control Act was "Congress's overriding concern … for decreasing the violent use of guns"). Plaintiffs' arguments that the exclusion applies only to ammunition, *i.e.*, shotgun shells,

---

Once we include this in the law, it is open for exclusion? I understand some attempt is to be made here to include shotguns, and also to include shells. If at this point, by vote, we exclude them, can we include them later on?

Mr. Dodd. This is just excluding them from the definition of destructive devices.

Mr. Pastore. I see. But is has nothing at all *to* do with the general attempt to include under controls shotguns and shotgun shells?

Mr. Dodd. It does not. It is just to exclude them from the definition of destructive device. 114 Cong. Rec. 26,900. The court also notes that the reference to the amended term "destructive device" as "a noncontroversial measure" was a statement by Senator Hruska indicating that similarity between the measure at issue and "similar … measures [he] introduced in the Senate as long as 3 years ago in a vain effort to try to dispose of a noncontroversial measure at that time." *Id.* Senator Hruska noted: "There was little or no difference of opinion as to the necessity of an updating and a radical revision of the Machine Gun Act." *Id.* With regard to the statement by Senator Cooper, who considered destructive devices *to* include "every kind of weapon which goes beyond the case of a shotgun, a sporting rifle, or a pistol or revolver," the court notes that this statement was made in the context of debate surrounding licensed dealers and licensed collectors. *Id.* at 26,903.

8. House Report No. 1577 accompanied the House bill, H.R. 17735—State Firearms Control

Assistance Act of 1968. Senate Report No. 1501 accompanied the Senate bill, S. 3633—Gun Control Act of 1968. Conference Report No. 1956, entitled Statement of the Managers on the Part of the House, accompanied H.R. 17735, which was subsequently passed as amended. The Conference Report was intended to reconcile the differences between the House and Senate with regard to the amending language. The Conference Report, *inter alia*, accepted the definition of a destructive device excluding shotguns and shotgun shells that the Secretary found to be generally used for sporting purposes. Although the inclusion of shotguns and the sporting purposes test appear to have generated some controversy, *see* 114 Cong. Rec. 27,461–65, the Conference Report seemingly represents Congress' resolution of these issues, particularly given that almost the identical language was adopted when the statute was passed.

9. Plaintiffs note accurately that the original definition of a destructive device, which was included in Title IV of the Omnibus Crime Control and Safe Streets Act of 1968, Pub.L. No. 90–351, 82 Stat. 197, 227–28 (1968) ("Title IV"), and stated in 18 U.S.C. § 921(a)(4), excluded all shotguns except short-barreled shotguns. *See* 18 U.S.C. § 921(b)(2)(C). This definition was amended shortly after passage of the bill to narrow the exclusion as represented above. *See* 18 U.S.C. § 921(a)(4). Plaintiffs' emphasis on Title IV, which was amended within months of enactment by the Gun Control Act of 1968, is misplaced.

flies in the face of legislative history, case law, and common sense.[10]

Pursuant to the plain language of the statute, the ATF, as the delegatee, has the authority to classify a shotgun and/or shotgun shell which was not generally recognized as suitable for sporting purposes as a destructive weapon. The question thus devolves to whether this was a proper delegation of authority by Congress.

### 3. *Delegation of legislative authority*

Plaintiffs assert that the phrase "generally recognized as particularly suitable for sporting purposes" fails to provide an intelligible standard from which the ATF may make determinations that a shotgun or shotgun shell is a destructive device. Specifically, although conceding that "particularly suitable for sporting purposes ... seems to lay down an intelligible principle," Plfs' Br. filed Dec. 11, 1998, at 13, plaintiffs contend that the combination of the phrase "generally recognized as" with the sporting purposes test renders "the entire phrase boundless ... [and] dependent not upon an analysis of the characteristics of the shotgun itself, but rather upon whether some unspecified class of persons recognizes the shotgun" as falling within the sporting purposes test. Plfs' Br. filed Mar. 24, 1999, at 11; *see* Tr. at 16. In the absence of an intelligible standard, plaintiffs maintain that this is an instance in which the delegation of authority is unconstitutional.

Defendant rejoins that the sporting purposes test is the same test enunciated under 18 U.S.C.A. § 925(d)(3) (Supp.1999), which provides:

The Secretary shall authorize a firearm or ammunition to be imported or brought

into the United States ... if ... the firearm or ammunition—

....

is of the type that does not fall within the definition of a firearm as defined in section 5845(a) of the Internal Revenue Code of 1954 and is *generally recognized as particularly suitable for or readily adaptable to sporting purposes....*

(Emphasis added.) Not only have the courts consistently upheld this test, but defendant argues that the sporting purposes test is narrower than other tests previously found constitutional.

■ "All legislative Powers ... shall be vested in a Congress of the United States...." U.S. Const., Art. 1, § 1. Although Congress may not delegate this authority, it may seek assistance from the other branches of Government. *See Touby v. United States,* 500 U.S. 160, 165, 111 S.Ct. 1752, 114 L.Ed.2d 219 (1991); *Mistretta v. United States,* 488 U.S. 361, 371–72, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989). "Thus, Congress does not violate the Constitution merely because it legislates in broad terms, leaving a certain degree of discretion to executive or judicial actors." *Touby,* 500 U.S. at 165, 111 S.Ct. 1752. Such delegation is not forbidden if given within the context of an intelligible standard to which the delegatee must adhere. *See id.* (citing cases and finding that "'imminent hazard to the public safety'" was intelligible principle) (citation omitted); *Mistretta,* 488 U.S. at 372, 109 S.Ct. 647; *Grymes Hill Manor Estates v. United States,* 179 Ct.Cl. 466, 470–71, 373 F.2d 920, 922 (1967) (finding liberal delegation constitutional because "policy of the statutory provision is clearly apparent, the Con-

---

**10.** That certain shotguns and shotgun shells could be subject to classification as destructive devices is also suggested by case law. *See United States v. Greer,* 588 F.2d 1151, 1154, 1154–57 (6th Cir.1978) (stating 26 U.S.C. § 5845(f)(2) "deals with large-bore weapons other than sporting guns"); *see also Cox v. ATF,* 571 F.2d 267, 268 n. 2 (5th Cir.1978) (noting weapons within classification of 26 U.S.C. § 5845 are associated typically with criminal activity, having "little or no sporting use"). Moreover, plaintiffs have cited no evidence demonstrating that only shotgun shells were directly at issue. Plaintiffs conceded at oral argument that "[t]here is no discussion

... of shotgun shells" in either the committee reports or floor debates. Tr. at 38. Notably, the Conference Report recited:

Under the House bill the term "ammunition" was defined to include only ammunition for destructive devices, pistols, and revolvers and was defined to exclude shotgun shells .... Under the Senate amendment such term was defined to mean all ammunition and components of ammunition for all firearms. The conference substitute adopts the Senate amendment.

Conference Report at 4428. Thus, the record belies plaintiffs' assertions.

gress has delineated the public agency to apply it, and has fixed the boundaries of the delegated authority") (footnote omitted). Broad delegations facilitate both legislative and administrative processes by granting authority to those agencies possessing specialized knowledge and thus best suited to realizing Congress' intent. *See Grymes Hill*, 179 Ct.Cl. at 470–71, 373 F.2d at 922.

In *Mistretta* the Supreme Court discussed judicial review of Congress' attempts to delegate authority:

> Until 1935, this Court never struck down a challenged statute on delegation grounds. *See Synar v. United States*, 626 F.Supp. 1374, 1383(DC) (three-judge court), *aff'd sub nom., Bowsher v. Synar*, 478 U.S. 714, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986). After invalidating in 1935 two statutes as excessive delegations, *see A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 [ (1935) ], and *Panama Refining Co. v. Ryan*, [293 U.S. 388, 421, 55 S.Ct. 241, 79 L.Ed. 446 (1935)], we have upheld, again without deviation, Congress' ability to delegate power under broad standards. *See, e.g., Lichter v. United States*, 334 U.S. 742, 785–786, 68 S.Ct. 1294, 92 L.Ed. 1694 (1948) (upholding delegation of authority to determine excessive profits); *American Power & Light Co. v. SEC*, 329 U.S. [90], 105, 67 S.Ct. 133, 91 L.Ed. 103 (upholding delegation of authority to Securities and Exchange Commission to prevent unfair or inequitable distribution of voting power among security holders); *Yakus v. United States*, 321 U.S. 414, 426, 64 S.Ct. 660, 88 L.Ed. 834 (1944) (upholding delegation to Price Administrator to fix commodity prices that would be fair and equitable,

and would effectuate purposes of Emergency Price Control Act of 1942); *FPC v. Hope Natural Gas Co.*, 320 U.S. 591, 600, 64 S.Ct. 281, 88 L.Ed. 333 (1944) (upholding delegation to Federal Power Commission to determine just and reasonable rates); *National Broadcasting Co. v. United States*, 319 U.S. 190, 225–26, 63 S.Ct. 997, 87 L.Ed. 1344 (1943) (upholding delegation to Federal Communications Commission to regulate broadcast licensing "as public interest, convenience, or necessity" require).

488 U.S. at 373–74, 109 S.Ct. 647 (footnote omitted).

■ Contrary to plaintiffs' contentions, the sporting purposes test enunciated in 18 U.S.C. § 925, is essentially the same test as that in 26 U.S.C. § 5845(f)(2).[11] Courts have previously upheld classifications made by the ATF pursuant to 18 U.S.C. § 925. *See Gilbert Equip. Co. v. Higgins*, 709 F.Supp. 1071 (S.D.Ala.1989), *aff'd*, 894 F.2d 412 (11th Cir. 1990) (Table); *see also Gun South, Inc. v. Brady*, 877 F.2d 858, 866 (11th Cir.1989). By extension, it is logical that classifications under 26 U.S.C. § 5845(f)(2) similarly are proper exercises of the agency's discretion, which may be reviewed in a proceeding to determine if a rational basis for the decision exists. *See Chevron*, 467 U.S. at 844, 104 S.Ct. 2778 ("We have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer, and the principle of deference to administrative interpretations.") (footnote omitted). The mere fact that the ATF may exercise some discretion in determining whether shotguns or shotgun shells are generally recognized as

11. The ATF noted that the definitions under 18 U.S.C. § 925(d)(3) and 26 U.S.C. § 5845(f)(2) were the same, with the exception of the phrase "readily adaptable." *See* ATF Ruling 94–2 at 24. Plaintiffs argue that the "readily adaptable" language included in 18 U.S.C. § 925(d)(3) transforms the sporting purposes test into something other than the sporting purposes test enunciated in 26 U.S.C. § 5845(f)(2). For purposes of the instant matter, this is a distinction without difference.

Furthermore, the ATF Ruling revisited prior rulings regarding the Striker–12:

> In 1984, ATF ruled that the Striker–12 was not eligible for importation under section 925(d)(3) since it is not particularly suitable for sporting purposes. In making this determination, the 1984 letter-ruling notes that the Striker was being used in a number of "combat" shooting events. In a letter dated June 30, 1986, ATF again denied importation to the Striker–12, on the basis that it did not meet the "sporting purposes" test of section 925(d)(3). This letter states that, "We believe the weapon to have been specifically designed for military and law enforcement uses."

ATF Ruling 94–2 at 24–25.

particularly suitable for sporting purposes does not render the delegation of authority impermissible. *See Grymes Hill,* 179 Ct.Cl. at 471, 373 F.2d at 923 (finding discretion is not fatal " 'where Congress has prescribed the general standard and has left to an administrative agency the determination of the precise situations to which the provisions . . . will be applied' ") (citations omitted). The statutory language of 26 U.S.C. § 5845 makes clear that the ATF's authority applies only to the classification of shotguns and/or shotgun shells that are found not generally recognized as suitable for sporting purposes. *See also Gun South,* 877 F.2d at 863 (stating 18 U.S.C. § 925(d)(3) "requires the Secretary to authorize the importation of sporting firearms" and noting Senate Report recognized "unusually broad discretion" in application of this statute by Secretary).

Congress has provided a sufficiently intelligible guide for the ATF to follow in determining whether a shotgun or shotgun shell falls within the definition of a destructive device. This statute does not permit the classification of all shotguns or shotgun shells as destructive devices and excludes those that are commonly used for sporting purposes. This standard is sufficiently definite to provide boundaries to the ATF's authority. This test is further delimited by the intent and purpose behind the amendments to the Gun Control Act of 1968, which included "[t]he urgent need for adding restrictions on transactions in long guns equivalent to those Congress has already applied to handguns." House Committee Report at 4413. The Gun Control Act, in amending 18 U.S.C. Chap. 44, also recited:

> The Congress hereby declares that the purpose of this title is to provide support to Federal, State, and local law enforcement officials in their fight against crime and violence, and it is not the purpose of this title to place any undue or unnecessary Federal restrictions or burdens on law-abiding citizens with respect to the acquisition, possession, or use of firearms appropriate to the purpose of hunting, trapshooting, target shooting, personal protection, or any other lawful activity . . . .

Pub.L. No. 90–618, 82 Stat. 1213–14, § 101. Congress' purpose and intent is thus revealed plainly.

With regard to plaintiffs' objection that the phrase "generally recognized as" makes boundless the ATF's authority, it is significant that the ATF did not focus on this as a part of its classification process.[12] Although noting the phrase "generally recognized as" at least three times in Ruling 94–2, the ATF utilized the test enunciated in 18 U.S.C. § 925(d)(3) and analyzed the physical characteristics of the weapon, the general use of the weapon, as well as the weapon's similarity to shotguns used for sporting purposes and combat.

> In evaluating the physical characteristics of the Striker–12/Streetsweeper, ATF concludes that the weight, bulk, designed magazine capacity, configuration, and other features indicate that it was designed primarily for military and law enforcement use and is not particularly suitable for sporting purposes.

The weight of the Striker—12/Streetsweeper, 9.24 pounds unloaded, is on the high end for traditional 12–gauge sporting shotguns, which generally weigh between 7 and 10 pounds. Thus, the weight of the Striker–12/Streetsweeper makes it awkward to carry for extended periods, as in hunting, and cumbersome to fire at multiple small moving targets, as in skeet and trap shooting. The width of the Striker–12/Streetsweeper, 5.7 inches, far exceeds that of traditional sporting shotguns, which do not exceed three inches in width or four inches in depth. The large size and bulk of the Striker–12/Streetsweeper make it extremely difficult to maneuver quickly enough to engage moving targets as is necessary in hunting, skeet, and trap shooting. The spring driven revolving magazine with 12–cartridge capacity is a much larger capacity than traditional repeating sporting shotguns, which generally

---

12. Although contesting whether the phrase "generally recognized as" sets forth an intelligible principle, plaintiffs concede that the ATF did not base its determination regarding the Striker–12 on this phrase. *See* Plfs' Br. filed Mar. 24, 1999, at 12.

contain tubular magazines with a capacity of 3–5 cartridges. The folding shoulder stock and the two pistol grips are not typical of sporting-type shotguns. Finally, the overall appearance and general shape of the weapon are radically different from traditional sporting shotguns and strikingly similar to shotguns designed specifically for or modified for combat and law enforcement use.

ATF Ruling 94–2 at 25.

Reference to private individuals when making a determination strains the limits of constitutionality. *See Yakus v. U.S.*, 321 U.S. at 424, 64 S.Ct. 660 (discussing impermissible delegation in *A.L.A. Schechter*, 295 U.S. at 541–42, 55 S.Ct. 837, which provided no standard thus granting virtually unfettered discretion). However, in making its determination, the ATF did not rely on an unidentified group from which to determine whether the shotgun was "generally recognized as" permissible under the sporting purposes test, but, rather, relied on quantifiable characteristics of the Striker–12.[13] Furthermore, the phrase "generally recognized as" neither requires that the ATF resort to private individuals or groups, nor grants to the ATF unlimited authority. *See Gilbert Equip.*, 709 F.Supp. at 1082–83 (discussing Senate recommendations surrounding enforcement of "sporting purposes" test, which included advisory panel). Case law reveals that the

> ATF views the "generally recognized" qualification to require both that the firearm itself or the "type" of firearm to which the subject firearm is being compared have attained general recognition as being particularly suitable for … sporting purposes, and that a particular use of a firearm have attained general recognition as being a "sporting purpose," or that an event have attained general recognition as being a "sport," before those uses and/or events can be "sporting purposes" or "sports" ….

*Gilbert Equip.*, 709 F.Supp. at 1085, 1085–86 (discussing 18 U.S.C. § 925(d)(3)) (footnotes

omitted); *see also Gun South*, 877 F.2d at 866 (" '[G]enerally recognized' in 925(d)(3) suggests a community standard which may change over time even though the firearm remains the same. Thus, a changing pattern of use may significantly affect whether a firearm is *generally recognized as particularly suitable for* … a sporting purpose."). The mere fact that Congress may have drafted the language of 26 U.S.C. § 5845(f)(2) more precisely does not render the statute unconstitutionally vague. *United States v. Powell*, 423 U.S. 87, 94, 96 S.Ct. 316, 46 L.Ed.2d 228 (1975) (analyzing 18 U.S.C. § 1715).

Where, as here, the agency can follow the statutory guide and achieve the end intended by Congress, the delegation is constitutional. "Such straining to inject doubt as to the meaning of words where no doubt would be felt by the normal reader is not required by the 'void for vagueness' doctrine, and we will not indulge in it." *Id.* at 93, 96 S.Ct. 316. "Standards prescribed by Congress are to be read in the light of the conditions to which they are to be applied. 'They derive much meaningful content from the purpose of the Act, its factual background and the statutory context in which they appear.'" *Lichter v. United States*, 334 U.S. 742, 785, 68 S.Ct. 1294, 92 L.Ed. 1694 (1948) (quoting *American Power*, 329 U.S. at 104, 67 S.Ct. 133). Analyzing the statutory language and its purpose, the court concludes that Congress has provided an intelligible principle, which applies to limited circumstances and is capable of review in a proper proceeding. *See Mistretta*, 488 U.S. at 379, 109 S.Ct. 647 (citing *Yakus*, 321 U.S. at 425–26, 64 S.Ct. 660).

## CONCLUSION

The plain meaning of the statute indicates that the qualifying language within the exclusionary clause is applicable to both shotgun and shotgun shell. The ATF therefore has the authority to classify the Striker–12 as a destructive device. The statutory standard—"generally recognized as particularly suitable for sporting purposes"—provides an

---

**13.** Plaintiffs do not contend that the Striker–12 is suitable for sporting purposes. *See supra* note 3; *see also supra* note 6.

intelligible standard for the ATF to follow in making such rulings and is thus constitutionally sufficient. Accordingly, based on the foregoing,

1. Plaintiffs' motion for summary judgment is denied, and defendant's cross-motion for summary judgment is granted.

2. The Clerk of the Court shall enter judgment for defendant.

**IT IS SO ORDERED.**